CITIZENS PROTECTING MICHIGAN'S CONSTITUTION
v SECRETARY OF STATE

Docket No. 286734. Submitted August 19, 2008, at Lansing. Decided August
20, 2008, at 9:00 a.m. Leave to appeal denied, 482 Mich 960.

Citizens Protecting Michigan's Constitution and others brought an
original action in the Court of Appeals against the Secretary of
State and the Board of State Canvassers, seeking a writ of
mandamus directing the defendants to reject an initiative petition
filed by Reform Michigan Government Now! (RMGN). The initia-
tive petition would affect four articles of the constitution, modify
24 current sections of the constitution, and add four new sections
to the constitution. RMGN was allowed to intervene in the action
as a defendant. The plaintiffs argued that the initiative petition
does not meet the requirements of Const 1963, art 12, § 2, for an
"amendment" of the constitution by petition and a vote of the
electors, and that the petition instead seeks a "revision" of the
constitution that, pursuant to Const 1963, art 12, § 3, must be
accomplished through a constitutional convention and a vote of
the electors.

The Court of Appeals *held*:

1. The Michigan Constitution establishes separate methods for
enacting an amendment, as compared to a general revision, of the
constitution. The procedure for amending the constitution cannot
be used to effectuate a general revision of the constitution. The
proposal submitted by RMGN seeks a general revision of the
constitution that cannot be accomplished through the initiative
petition procedure applicable to amendments. The constitutional
power of initiative does not extend to the proposal submitted by
RMGN. The defendants have a clear legal duty to reject the
petition. An order must be entered directing the defendants to stop
the canvass of the petition, reject the petition, and not allow the
proposal to be placed on the ballot.

2. Although the Board of State Canvassers had not yet made a
determination regarding the sufficiency of the initiative petition,
the plaintiffs' complaint does not challenge the sufficiency of the
petitions but, rather, seeks a threshold determination regarding
whether the changes sought by RMGN may be accomplished

through an amendment of the constitution. Therefore, the claim is ripe for a decision by the Court of Appeals.

3. A court, in order to determine whether a proposal effects a general revision of the constitution, and is therefore not subject to the initiative process established for amending the constitution, must consider both the quantitative nature and the qualitative nature of the proposed changes. The determination depends on not only the number of proposed changes, or whether a wholly new constitution is being offered, but on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government. The RMGN proposal clearly falls within the realm of a general revision of the constitution. The power of initiative established by Const 1963, art 12, § 2, does not extend to the RMGN initiative petition.

Relief sought in the complaint for a writ of mandamus granted.

1. Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Aᴍᴇɴᴅᴍᴇɴᴛs — Gᴇɴᴇʀᴀʟ Rᴇᴠɪsɪᴏɴs.

The constitution establishes separate methods for an amendment of and a general revision of the constitution; the provisions are not alternatives and the procedure for amending the constitution cannot be used to effectuate a general revision of the constitution (Const 1963, art 12, §§ 2, 3).

2. Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Aᴍᴇɴᴅᴍᴇɴᴛs — Gᴇɴᴇʀᴀʟ Rᴇᴠɪsɪᴏɴs.

A court must consider both the quantitative nature and the qualitative nature of proposed constitutional changes in order to determine whether a proposal effects a general revision of the constitution and is therefore not subject to the initiative process established for amending the constitution; the determination depends on not only the number of proposed changes, but the scope of the proposed changes and the degree to which those changes would interfere with or modify the operation of government (Const 1963, art 12, §§ 2, 3).

*Dickinson Wright PLLC* (by *Peter H. Ellsworth, Jeffery V. Stuckey*, and *Scott R. Knapp*) and *Honigman Miller Schwartz and Cohn LLP* (by *John D. Pirich* and *Andrea L. Hansen*) for the plaintiffs.

*Michael A. Cox*, Attorney General, and *Susan I. Leffler, Denise C. Barton*, and *Heather S. Meingast*, Assistant Attorneys General, for the defendants.

*Sachs Waldman, P.C.* (by *Andrew Nickelhoff*), for Reform Michigan Government Now!

Amicus Curiae:

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Mark G. Sands* and *Joshua S. Smith*, Assistant Attorneys General, for the Attorney General.

Before: SCHUETTE, P.J., and WHITBECK and METER, JJ.

PER CURIAM. Plaintiffs have filed an original action in this Court, seeking a writ of mandamus against defendants Michigan Secretary of State (the Secretary) and the Michigan Board of State Canvassers (the Board). Plaintiffs request a writ directing the Secretary and the Board to reject an initiative petition that intervening defendant Reform Michigan Government Now! (RMGN) has filed. The RMGN initiative petition seeks to place a proposal on the ballot for the November 2008 general election that would modify the Michigan Constitution. We grant the relief sought in the complaint for a writ of mandamus.

## I. INTRODUCTION

The issues before this Court concern the interpretation and application of certain provisions of the Michigan Constitution of 1963. The framers of Michigan's Constitution inserted specific provisions, which must be followed, not overlooked, when seeking to modify our state's guiding legal document. As Judge METER observed several years ago:

> The Constitution reigns supreme. It is an immutable, enduring document. Its fundamental integrity cannot be diluted nor tarnished by those who would interpret it in a

myopic, transient or parochial fashion. The principles enunciated therein will not change unless we the People so decide by prescribed methods. It is also inviolate. There should be no modification to the sacred document we call our Constitution unless there are no less invasive or intrusive means to accomplish needed change. This I call the constitutional doctrine of manifest necessity. [Meter, *An analysis of the unified trial court*, 20 Quinnipiac L R 697, 706 (2001).]

Today our Court reaffirms these principles. Constitutional modification requires strict adherence to the methods and approaches included in the constitution itself. Shortcuts and end runs to revise the constitution, which ignore the pathways specifically set forth by the framers, cannot be tolerated. As Justice MARKMAN said in his concurrence in *Michigan United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 393; 630 NW2d 297 (2001) (*MUCC III*), "the 'overarching right of the people' is to have the constitution that they have ratified given respect and accorded its proper meaning."

We offer no opinion on the merits of any or all of the substantive matters contained in the RMGN initiative petition. Also, let us be clear at the outset what our opinion today does *not* do. We do *not* act to prevent the citizens from voting on a proposal simply because that proposal is allegedly too complex or confusing. Nor do we seek to substitute our own preferences regarding governmental form, structure, or functioning for those of the electorate. We do *not*, for example, determine whether reducing the salaries of legislators and certain executive branch officers is a good idea or a bad one. Nor do we decide whether establishing new financial disclosure requirements for elected officials and candidates for public office should be done in the constitution, by statute, or not at all. We do *not* agree or disagree

with the redistricting criteria or process contained in the RMGN proposal. And we most certainly do *not* address the question whether there should be a reduction in judicial salaries and in the number of appellate court judgeships on the ground that these judgeships are "unnecessary." The broad range of public policy issues, and those items that involve politics and elections, are not the province of the judicial branch of government.

RMGN contends that plaintiffs' arguments amount to a "judicial veto," preventing a vote on this massive initiative petition. RMGN misstates the legal issue and ignores specific constitutional requirements, and its argument reflects an appeal to the court of public opinion, not a court of law. Our decision interprets and applies provisions of the constitution of the state of Michigan, nothing less and nothing more.

As we will explain, the Michigan Constitution clearly establishes separate methods for enacting an "amendment" to, as compared to a "general revision" of, the constitution. It is absolutely clear that the procedure for amending the constitution cannot effectuate such a "general revision." Here, RMGN submitted its proposal under the initiative petition procedure that Const 1963, art 12, § 2, established for amending the constitution. However, we conclude that the proposal is a "general revision" of the constitution. Only the constitutional convention procedure established by Const 1963, art 12, § 3, can accomplish such a general revision. Therefore, the constitutional power of initiative does not extend to this proposal. Accordingly, the RMGN initiative petition does not meet the constitutional prerequisites for acceptance and the Board and the Secretary have a clear legal duty to reject the petition. Concurrently with the release of this opinion, we have issued an order direct-

ing the Secretary and the Board to stop the canvass, to reject the RMGN initiative petition, and to not allow the proposal to be placed on the ballot.

## II. FACTS AND PROCEDURAL HISTORY

### A. THE PARTIES

#### (1) PLAINTIFFS .

Citizens Protecting Michigan's Constitution is a "ballot question committee" organized for the purpose of challenging the RMGN petition. Lowell R. Ulrich is the chief judge of the Chippewa County Probate Court. Michael Bishop and Alan Cropsey are members of the Michigan State Senate. Virgil Smith, Jr., is a member of the Michigan State House of Representatives. Mike Bryanton is the Ingham County Clerk.

#### (2) DEFENDANTS

The Secretary holds office under the constitution. See Const 1963, art 5, § 3. The Secretary is the single executive, see *id.*, heading the Department of State. The Department of State is one of the principal departments in the executive branch of state government. See MCL 16.104(1). The Secretary is the chief election officer of the state and has supervisory authority over local election officials in the performance of their duties. MCL 168.21.

The Board is established by the constitution and by statute. Const 1963, art 2, § 7; MCL 168.22. It is the Board that canvasses an initiative petition to ascertain if the requisite number of qualified and registered electors has signed the petition and that makes a final determination regarding the sufficiency of a petition. See MCL 168.476.

### (3) INTERVENING DEFENDANT

We granted RMGN permission to intervene in this matter. RMGN is a "ballot question committee" that was organized for the purpose of drafting, circulating, collecting signatures for, and submitting for approval the initiative petition that is being challenged here.

### (4) AMICUS CURIAE

We granted the Attorney General permission to file a brief as amicus curiae. Although the Attorney General's office represents the Board and the Secretary, the Attorney General asserts that he has an independent obligation as a state officer to protect and defend the constitution.

### B. THE RMGN INITIATIVE PETITION

The RMGN initiative petition seeks to alter four articles of the Michigan Constitution of 1963: article 2 (elections), article 4 (legislative branch), article 5 (executive branch), and article 6 (judicial branch). More specifically, as the Attorney General points out, the proposal would, among other things:

(1) allow voting by absentee ballot without giving a reason;

(2) establish in the executive branch a new office of elections;

(3) modify the referendum procedure;

(4) modify the initiative procedure;

(5) reduce the number of legislators in the state Senate from 38 to 28;

(6) reduce the number of legislators in the state House of Representatives from 110 to 82;

(7) create a new commission with sole and exclusive authority over legislative districting;

(8) establish specific rules for creating legislative districting plans;

(9) eliminate the current provision allowing for judicial review of districting plans;

(10) limit lobbying activities of members of the Legislature who leave office;

(11) reduce the base salaries of legislators, the Governor, the Lieutenant Governor, the Attorney General, and the Secretary;

(12) authorize the Legislature to grant any citizen standing to bring certain environmental lawsuits;

(13) alter the pension and retirement benefits of legislators, certain executive officers, and judges elected after January 1, 2009;

(14) provide for public inspection of financial records of the Legislature;

(15) reduce the maximum number of principal departments in the executive branch;

(16) limit the lobbying activities of heads of principal departments in the executive branch after leaving office;

(17) establish a maximum number of state boards and commissions;

(18) require a separate vote to elect the Governor and the Lieutenant Governor, rather than a single joint vote for the Governor and the Lieutenant Governor candidates nominated by the same party;

(19) eliminate the Governor's authority to fill vacancies in the office of the Secretary and the Attorney General;

(20) require financial disclosures by certain elected officials (including judges and legislators) and candidates for those positions;

(21) reduce the number of Supreme Court justices from seven to five;

(22) require the Supreme Court to issue rules for the public inspection of documents and records relating to the administration of the courts;

(23) reduce the number of Court of Appeals judges to 21;

(24) reduce the number of Court of Appeals districts to three;

(25) eliminate the Legislature's authority to increase the number of Court of Appeals judges and change the districts from which they are elected;

(26) add 10 circuit court judgeships;

(27) reduce judicial salaries by 15 percent;

(28) require the Legislature to implement certain requirements regarding jury lists; and

(29) replace the Judicial Tenure Commission with a judicial performance commission, composed primarily of nonlawyer citizens.

### C. THE FILING OF THE RMGN INITIATIVE PETITION

RMGN filed its initiative petition with the Secretary on July 7, 2008. The Secretary subsequently notified the Board, and the Board has since begun its canvass of the petition. In a letter of July 23, 2008, to plaintiffs' counsel, the Secretary expressed an intention "to proceed with the actions necessary to place this proposal on the ballot provided the requisite number of valid signatures have been submitted."

### D. THE COMPLAINT FOR A WRIT OF MANDAMUS

On July 24, 2008, plaintiffs filed their complaint for a writ of mandamus in this Court. Plaintiffs claim that the RMGN initiative petition is not eligible to be placed on the ballot because it is not merely an "amendment" to the constitution, but is a "general revision" of the constitution that only a constitutional convention can

accomplish. Plaintiffs further claim that the RMGN initiative petition is not eligible to be placed on the ballot because it offers more than a single amendment with a single purpose.

III. ANALYSIS

A. JURISDICTION

This Court has original jurisdiction to entertain an action for "mandamus against a state officer." MCR 7.203(C)(2), citing MCL 600.4401. The Secretary and the Board are "state officers" for purposes of mandamus. See, e.g., *Citizens for Protection of Marriage v Bd of State Canvassers*, 263 Mich App 487, 491; 688 NW2d 538 (2004). Therefore, this case is within our jurisdiction.

B. "RIPENESS"

RMGN argues that this case is not properly before the Court because the Board has not yet made its sufficiency determination regarding the initiative petition. Although RMGN phrases the argument in terms of jurisdiction, we do not consider this a jurisdictional issue, but a "ripeness" issue. A claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or may not occur at all. *Huntington Woods v Detroit*, 279 Mich App 603, 615-616; ___ NW2d ___ (2008). RMGN essentially argues that because its initiative petition is currently before the Board, there remains the possibility that the Board will deem the initiative petition insufficient and the submission of the proposal on the ballot may not occur. However, we hold that this case is indeed "ripe" for a decision by this Court.

In *Michigan United Conservation Clubs v Secretary of State (On Remand)*, 246 Mich App 82; 630 NW2d 379 (2001) (*MUCC II*), rev'd 464 Mich 359 (2001), the plain-

tiffs sought a writ of mandamus ordering the Secretary and the Board to reject a petition for a referendum. This Court, by order, initially denied mandamus on the ground that the issue was not ripe because the Board had not completed its canvass. However, the Supreme Court in lieu of granting leave to appeal, vacated our order and remanded the case for plenary consideration. In so doing, the Supreme Court stated:

> The issue in this case is whether the referendum sought is with respect to a law "making appropriations for state institutions or to meet deficiencies in state funds." Const 1963, art 2, § 9. This controversy is ripe for review because it is not dependent upon the Board of Canvassers' counting or consideration of the petitions but rather involves a threshold determination whether the petitions on their face meet the constitutional prerequisites for acceptance. All of the information necessary to resolve this controversy, i.e., whether 2000 PA 381 constitutes a law which is excepted from the referendum process under Const 1963, art 2, § 9, is presently available. [*Michigan United Conservation Clubs v Secretary of State*, 463 Mich 1009 (2001) (*MUCC I*) (internal citations omitted).]

Here, plaintiffs are arguing that, for reasons *other than the sufficiency of the RMGN initiative petition*, the proposal is not eligible to be placed on the ballot. Essentially, plaintiffs contend that this case involves a "threshold determination" that is ripe for our consideration because its resolution is not dependent on any determination by the Board. We agree and conclude that the doctrine of ripeness does not preclude our resolution of plaintiffs' claims.

### C. MANDAMUS

#### (1) REQUIREMENTS FOR MANDAMUS

Mandamus is the appropriate remedy for a party seeking to compel action by election officials. See, e.g.,

*Wolverine Golf Club v Secretary of State*, 24 Mich App 711; 180 NW2d 820 (1970), aff'd 384 Mich 461 (1971); *Automobile Club of Michigan Comm for Lower Rates Now v Secretary of State* (*On Remand*), 195 Mich App 613; 491 NW2d 269 (1992). That said, a writ of mandamus is an extraordinary remedy and will only be issued where (1) the party seeking the writ has a clear legal right to performance of the specific duty sought, (2) the defendant has the clear legal duty to perform the act requested, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result. *Tuggle v Dep't of State Police*, 269 Mich App 657, 668; 712 NW2d 750 (2005); *Genesis Ctr, PLC v Comm'r of Financial & Ins Services*, 246 Mich App 531, 546; 633 NW2d 834 (2001). We also note that, under MCR 7.216(A)(7), this Court can, in our discretion and on terms we deem just, "enter any judgment or order and grant further or different relief as the case may require."

### (2) POSITIONS OF THE PARTIES

The Secretary, the Board, and RMGN argue that plaintiffs have failed to establish the necessary prerequisites for granting mandamus. In particular, they argue that determining whether a proposal is an "amendment" to, or a "general revision" of, the constitution, or whether a proposal has more than a single purpose, is beyond the scope of the authority of the Secretary and the Board. Therefore, they argue, plaintiffs cannot establish that the Secretary and the Board have a clear legal duty to preclude submission of the RMGN proposal to the electors. They go on to argue that even if such duties exist, the exercise of those duties would not be a ministerial task.

Plaintiffs argue to the contrary. According to plaintiffs, the Board and the Secretary do indeed have a clear legal duty to make the "threshold determination" of whether the proposal is eligible to be placed on the ballot. Plaintiffs then note that the Secretary, in her July 23, 2008, letter, and on the basis of her belief that it is not her job to do so, has expressly declined to address the threshold ballot-eligibility questions that plaintiffs raise. They assert that if the RMGN proposal is not "ballot eligible," the proper, indeed the only, remedy is a writ of mandamus.

The Attorney General argues that the RMGN initiative petition is a revision of the constitution, and therefore not the proper subject of an initiative petition, but he does not specifically take a position on whether mandamus should issue.

### (3) EXISTENCE OF A CLEAR LEGAL DUTY

This Court has previously held that the Board's duties with regard to a proposed constitutional amendment are "limited to determining whether the form of the petition substantially complies with the statutory requirements and whether there are sufficient signatures to warrant certification of the proposal." *Citizens for Protection of Marriage, supra* at 492; see also MCL 168.476 and MCL 168.482. The Board has no authority to consider the lawfulness of a proposal. *Citizens for Protection of Marriage, supra* at 493. The Board must complete its canvass and make the official declaration of the sufficiency or insufficiency of the petition "at least 2 months before the election" at which the proposal is to be submitted. MCL 168.476(2); MCL 168.477(1). The Board also has the responsibility to approve the proposal's statement of purpose, which the Director of Elec-

tions creates and which is not to exceed 100 words. MCL 168.474; MCL 168.22e; see also *Citizens for Protection of Marriage, supra* at 494.

The Secretary's duties in regard to an initiative petition are also limited. Upon the filing of a signed petition, the Secretary must "immediately" notify the Board by first-class mail. MCL 168.475(1). The Secretary has no further duties until after the Board deems a petition sufficient and approves the Director of Elections' statement of purpose. Once the Board approves the statement of purpose, the Secretary must send copies of the statement of purpose to newspapers to give "as wide publicity as possible . . . ." MCL 168.477(1). In addition, the Secretary must "[p]repare the form of ballot for any proposed amendment to the constitution or proposal under the initiative or referendum provision of the constitution to be submitted to the voters of this state." MCL 168.31(1)(f). The Secretary then provides the form, along with copies of the proposed amendment of the constitution, to the county clerks. MCL 168.480.

On their face, these duties of the Board and the Secretary may not include making a "threshold determination" whether a ballot proposal is an "amendment" to, as opposed to a "general revision" of, the constitution or whether the ballot proposal contains more than one purpose. Further, an act is ministerial if it is " ' "prescribed and defined by law with such precision and certainty as to leave nothing to the exercise of discretion or judgment." ' " *Carter v Ann Arbor City Attorney*, 271 Mich App 425, 439; 722 NW2d 243 (2006) (citations omitted). We agree with the Secretary, the Board, and RMGN that determining whether a ballot proposal is an "amendment" to, or a "general revision" of, the constitution and determining

whether a ballot proposal serves more than one purpose involve, at a minimum, the exercise of judgment. But even assuming that the duties plaintiffs ascribe to the Board and the Secretary do not exist or, even if they do exist, that they are not "ministerial" in nature, we conclude that the Board and the Secretary have a clear legal duty that this Court can enforce in this particular case.

The entire history of the *Michigan United Conservation Clubs* case best illustrates the clear legal duty at issue here. As we mentioned earlier, this Court initially denied mandamus on the ground that the issue was not "ripe" because the Board had not completed its canvass. The Supreme Court remanded the case for plenary consideration, stating that "[a]ll of the information necessary to resolve this controversy, i.e., whether 2000 PA 381 constitutes a law which is excepted from the referendum process under Const 1963, art 2, § 9, is presently available." *MUCC I, supra* at 1009. On remand, this Court denied the request for a writ of mandamus, concluding that 2000 PA 381 was indeed subject to the referendum process. See *MUCC II, supra* at 84, 93. On appeal after this Court's decision on remand, the Supreme Court reversed, holding:

> The issue here is whether 2000 Public Act 381 is exempt from the power of referendum of the Michigan Constitution. Having granted leave to appeal and heard oral argument, this Court finds as follows:
>
> (1) The power of referendum of the Michigan Constitution "does not extend to acts making appropriations for state institutions . . . ." Const 1963, art 2, § 9.
>
> (2) 2000 PA 381 states that "one million dollars is appropriated from the general fund to the department of state police . . . ." MCL 28.425w(1).

(3) An appropriation of $1,000,000 is an "appropriation," and the Department of State Police is a "state institution."

(4) Therefore, the power of referendum of the Michigan Constitution does not extend to 2000 PA 381.

Accordingly, consistent with Const 1963, art 2, § 9 and an unbroken line of decisions of this Court interpreting that provision, the Court of Appeals is reversed, and the relief sought in the complaint for mandamus is granted. The May 21, 2001 declaration by the Board of State Canvassers of the sufficiency of the petition for referendum on 2000 PA 381 is vacated and defendant Secretary of State and the Board of State Canvassers are directed that 2000 PA 381 is not subject to referendum for the reasons set forth herein. [*MUCC III, supra* at 365-366.]

*Michigan United Conservation Clubs* clearly establishes that challenges of the type made by plaintiffs in this case may be raised in a mandamus action against the Board and the Secretary *before* the Board's sufficiency determination.

The Secretary further contends that neither she nor the Board has a clear legal duty to conduct a substantive review of the RMGN initiative petition to determine its constitutional sufficiency. And, indeed, plaintiffs concede that it is well settled that a substantive analysis of the RMGN initiative petition is premature. In *Hamilton v Secretary of State*, 212 Mich 31, 34-35; 179 NW 553 (1920), the Michigan Supreme Court established that substantive constitutional challenges to the validity of a ballot proposal are premature when made before the voters adopt the proposition in question.[1] However, our Supreme Court has since made a

_____

[1] See *Fontana v Lindholm*, 276 Mich 361, 363; 267 NW 860 (1936) (stating that in *Hamilton* the Court held that "where a proposed amendment to the State Constitution was proper in form and contained

distinction between substantive challenges and questions related to whether the proposition is constitutionally eligible to be presented before the voters.

In a subsequent case, *Leininger v Secretary of State*, 316 Mich 644, 654-656; 26 NW2d 348 (1947), the Court carved out an exception to the *Hamilton* rule, holding that a constitutionally fatal defect in an initiative petition supported the issuance of a writ of mandamus prohibiting the Secretary of State from transmitting the proposed law. The *Leininger* Court explained that, unlike in *Hamilton*, "[i]n the case at bar . . . we are not concerned with the question of whether the substance of the proposed law is violative of the Federal or State Constitutions. Here the question is whether the petition, in form, meets the constitutional requirements so as to qualify it for transmittal to the legislature and submission to the people." *Id.* at 651. On this point, the words of Chief Justice OSTRANDER in *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918), are most instructive:

> Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. *But the right is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution.* [Emphasis added.]

This is exactly what is involved here. The inquiry here involves the "threshold determination" whether the RMGN initiative petition meets the constitutional pre-

the required number of signatures, it was the duty of the secretary of State to place it upon the ballot, that he may not question the constitutionality of said amendment, and that under such circumstances his duties were ministerial and not judicial").

requisites for placement on the ballot. This is not an instance of "judicial veto" that Justice SHARPE admonished against in *Hamilton, supra* at 38 (SHARPE, J., concurring).

*City of Jackson v Comm'r of Revenue*, 316 Mich 694; 26 NW2d 569 (1947), is also directly relevant. In that case, the plaintiffs, by way of mandamus, sought to compel the defendants to comply with an amendment of the constitution that the voters had approved in a general election. The amendment reached the ballot for the general election through an initiative petition. At one point, the Supreme Court stated:

> Defendants also claim that the amendment is void because it contains proposals for more than one purpose; and that it is an ineffectual attempt to revise the Constitution. The claims are without merit. We have carefully considered all of the objections raised as to the legality of the petitions and the manner in which this amendment has been submitted to the people. We find no defects in the petitions or in the manner of submitting the proposed amendment, to such extent that the amendment must now be declared a nullity. In that regard we are not unmindful of the fact that to now declare the amendment a nullity would thwart the expressed will of the voters. *We also are conscious of the fact that these objections might have been raised in advance of the submission, as was done in* Leininger v. Secretary of State [316 Mich 644; 26 NW2d 348 (1947)]. *In that case we found that the initiative petition was fatally defective*[2] *and directed the secretary of State, the State board of canvassers and the attorney general to refrain from submitting the proposal to the voters.* [*Id.* at 711 (emphasis added).]

---

[2] The "fatal defect" in *Leininger* was that the initiative petition was not in the proper "form"; in particular, the petition did "not contain the title of the proposed measure" as required by the constitution. *Leininger, supra* at 654.

The cases establish that a "threshold determination" of whether the RMGN initiative petition meets the constitutional prerequisites for acceptance is now ripe for a decision by this Court. Further, the cases establish that a petition will not meet the constitutional prerequisites for acceptance if the constitutional power of initiative does not extend to the proposal at issue. And, finally, the cases establish that if we determine that the RMGN initiative petition is not subject to the constitutional power of initiative, we may grant mandamus and direct the Board and the Secretary to reject the RMGN initiative petition.

Thus, assuming the Board and the Secretary have no clear legal duty to determine whether the RMGN initiative petition is an "amendment" to, or a "general revision" of, the constitution, or a duty to determine whether the RMGN initiative petition serves more than one purpose, then *this Court* must make the "threshold determination" that the RMGN initiative petition does not meet the constitutional prerequisites for acceptance. And, *at that point*, the Board and the Secretary have a clear legal duty to reject the RMGN petition. In other words, in this case, our order would not enforce any duty on the part of the Board and the Secretary to make the "threshold determination" whether the RMGN initiative petition is an "amendment" or a "general revision," or whether it serves more than one purpose. Rather, our order would enforce a duty on the part of the Board and the Secretary to reject the RMGN initiative petition in light of *our* "threshold determination" that it does not meet the constitutional prerequisites for acceptance. As noted earlier, we have the power under MCR 7.216(A)(7), in our discretion and on terms we deem just, to "enter any judgment or order or grant further or different relief as the case may require." And the subsequent act of the Secretary and the Board in

rejecting the RMGN initiative petition in light of our "threshold determination" would be ministerial in nature because it would not require the exercise of judgment or discretion.

### D. THRESHOLD DETERMINATIONS

#### (1) "AMENDMENT" VERSUS "GENERAL REVISION"

##### (a) CONSTITUTIONAL PROVISIONS

Const 1963, art 12, § 2, which pertains to amendment by petition and vote of electors, provides:

> Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

> Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail.

In contrast, Const 1963, art 12, § 3, which pertains to general revision of the constitution, provides:

At the general election to be held in the year 1978, and in each 16th year thereafter and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state. If a majority of the electors voting on the question decide in favor of a convention for such purpose, at an election to be held not later than six months after the proposal was certified as approved, the electors of each representative district as then organized shall elect one delegate and the electors of each senatorial district as then organized shall elect one delegate at a partisan election. The delegates so elected shall convene at the seat of government on the first Tuesday in October next succeeding such election or at an earlier date if provided by law.

The convention shall choose its own officers, determine the rules of its proceedings and judge the qualifications, elections and returns of its members. To fill a vacancy in the office of any delegate, the governor shall appoint a qualified resident of the same district who shall be a member of the same party as the delegate vacating the office. The convention shall have power to appoint such

officers, employees and assistants as it deems necessary and to fix their compensation; to provide for the printing and distribution of its documents, journals and proceedings; to explain and disseminate information about the proposed constitution and to complete the business of the convention in an orderly manner. Each delegate shall receive for his services compensation provided by law.

No proposed constitution or amendment adopted by such convention shall be submitted to the electors for approval as hereinafter provided unless by the assent of a majority of all the delegates elected to and serving in the convention, with the names and vote of those voting entered in the journal. Any proposed constitution or amendments adopted by such convention shall be submitted to the qualified electors in the manner and at the time provided by such convention not less than 90 days after final adjournment of the convention. Upon the approval of such constitution or amendments by a majority of the qualified electors voting thereon the constitution or amendments shall take effect as provided by the convention.

### (b) INTERPRETING THE CONSTITUTIONAL PROVISIONS

The difference in procedure established "for amendments and for revision undoubtedly was purposely made and cannot be ignored." *People v Bd of State Canvassers,* 323 Mich 523, 528; 35 NW2d 669 (1949) (interpreting Const 1908, art 17, §§ 1 and 4). Therefore, whether RMGN's initiative petition proposes an "amendment" or a "general revision" is of central significance: only a constitutional convention can make a "general revision" of the constitution. Stated differently, to allow the constitutional power of initiative to extend to a "general revision" of the constitution would be to ignore the framers' intentional differentiation in terms and procedure. Consequently, determining whether the RMGN proposal is an "amendment" to, or a "general revision" of, the constitution is of primary importance.

In this regard, we note that counsel for RMGN took the position at oral argument that the initiative procedure under Const 1963, art 12, § 2, would encompass an amendment, or series of amendments, that would result in a wholly new constitution. This position of necessity means that the initiative procedure under Const 1963, art 12, § 2, is an *alternative* to the constitutional convention procedure in Const 1963, art 12, § 3. In practical effect, therefore, Const 1963, art 12, § 3, would become superfluous. See *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 70; 748 NW2d 524 (2008) (stating that an interpretation that renders language meaningless must be avoided). We do not, therefore, consider Const 1963, art 12, § 2, and Const 1963, art 12, § 3, to be alternative provisions. Rather, they set out separate procedures for "amendments" as contrasted to "general revisions."

Further, we typically discern the common understanding of constitutional text "by applying each term's plain meaning at the time of ratification." *Nat'l Pride at Work, Inc, supra* at 67-68. We may discern the "plain meaning" by reference to a dictionary. See, e.g., *id.* at 69.

*Webster's Third New International Dictionary* (1965), p 68, defines an "amendment" as "the process of amending (as a motion, bill, act, or constitution)." To "amend" means "to alter (as a motion, bill, or law) formally by modification, deletion, or addition <[amend] the constitution>." *Id.* A "revision" is "an act of revising." *Id.* at 1944. To "revise" means "to make a new, amended, improved, or up-to-date version." *Id.* While somewhat helpful to the analysis, the dictionary definitions of "amendment" and "revision" do not completely reveal the differentiation that was intended by the framers of the constitution from their use of the words "amendment" and "revision."

However, decisions of our Supreme Court provide some clarity. For example, in *Kelly v Laing*, 259 Mich 212, 217-218; 242 NW 891 (1932), our Supreme Court considered the difference between a "revision" and an "amendment" in the context of a city charter. The question posed was "whether the changes of the nature here proposed may be made by amendment to the charter or only by revision." *Id.* at 216. The distinction was of import because there were different statutory methods for amending the charter and for revising the charter. *Id.* at 216-217. The Supreme Court delineated the differences between an amendment and a revision, stating:

> "Revision" and "amendment" have the common char-acteristics of working changes in the charter and are sometimes used inexactly, but there is an essential differ-ence between them. Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to accomplish its purpose. Basically, revi-sion suggests fundamental change, while amendment is a correction of detail. [*Id.* at 217.]

The Supreme Court went on to state:

> It is a specific instrument, the charter, as to which the change must be "within the lines" in order to constitute an amendment, not the general "subject of municipal govern-ment" or "local self-government." The latter, however, is a proper and principal consideration on revision.
>
> There is reason in the distinction made by the legisla-ture. An amendment is usually proposed by persons inter-ested in a specific change and little concerned with its effect upon other provisions of the charter. The machinery

of revision is in line with our historical and traditional system of changing fundamental law by convention, which experience has shown best adapted to make necessary readjustments.

From the express implication arising from an advisory vote in proceedings for revision, from the difference in method providing for difference in character of changes, and from the proper meaning of the words used, we are of the opinion that the statute must be construed to require that a change in the form of government of a home-rule city may be made only by revision of the charter. [*Id.* at 221-222.]

Although *Laing* specifically interpreted statutes and a city charter, not the constitution, we find the decision to be of significant relevance here, primarily in that *Laing* stands for the proposition that there is a *qualitative* aspect to the meanings of the words "amendment" and "revision" when used to describe changes to "fundamental law" such as the constitution. In particular, differentiating between an amendment and a revision requires consideration of the substance and the effect of the proposed changes.

*Pontiac School Dist v City of Pontiac*, 262 Mich 338; 247 NW 474 (1933), supports this conclusion. In that case, the Michigan Supreme Court considered a challenge to an amendment of the constitution approved in the November 1932 general election. The amendment, which had been initiated by a petition of qualified electors, limited property tax assessments and purportedly altered or abrogated "some 16 or 18 other provisions of the Constitution . . . ." *Id.* at 343. The plaintiff's challenge in *Pontiac School Dist* included an argument similar to the challenge that plaintiffs make here. In addressing the argument, the Supreme Court stated:

The validity of the 1932 amendment is further challenged on the ground that it is not an amendment, but instead it is so far reaching in its modification and restriction of governmental powers that it amounts to a revision of the State Constitution, and, not having been accomplished in the manner provided in the Constitution for revision (article 17, § 4), it is wholly ineffective and invalid. We are fully convinced that the adoption of this new limitation upon the power of taxation, under the construction hereinafter placed upon it, does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment by way of an addition to the Constitution. As an amendment it was legally adopted and became a part of our fundamental law. [*Id.* at 345.]

In *Laing* and *Pontiac School Dist*, our Supreme Court established the proper analysis for determining whether a proposal is a "general revision" of, or merely an "amendment" to, the constitution: the analysis should consider not only the *quantitative* nature of the proposed modification, but also the *qualitative* nature of the proposed modification. More specifically, the analysis does not turn solely on whether the proposal offers a wholly new constitution, but must take into account the degree to which the proposal interferes with, or modifies, the operation of government. The clear implication is that the greater the degree of interference with, or modification of, government, the more likely the proposal amounts to a "general revision."[3] Such a quantitative and qualitative analysis of

---

[3] There are some distinctions between *Pontiac School Dist* and the case here. Primarily, *Pontiac School Dist* was decided under the Michigan Constitution of 1908 and considered the issue of the propriety of the amendment *after* the amendment was approved in the general election. However, these distinctions are of no significant legal consequence. First, the 1908 Michigan Constitution is similar to the 1963 Michigan Constitution in that it also established separate methods for enacting "amendments" to, and a "general revision" of, the constitution. See Const 1908, art 17,

proposed changes is consistent with the analysis other states have used when considering the distinction between an "amendment" and a "revision" for purposes of modifying a state constitution.

### (c) OUT-OF-STATE DECISIONS

The primary out-of-state case that plaintiffs, RMGN, and the Attorney General discuss is *McFadden v Jordan*, 32 Cal 2d 330; 196 P2d 787 (1948). In *McFadden*, the petitioner sought a writ of mandamus against California's secretary of state directing him not to place an initiative proposal, titled the "California Bill of Rights,"[4] on the ballot. The issue before the California Supreme Court was whether the proposal was an attempted "revision" of the constitution, rather than an "amendment" to the constitution. This issue was critical because the California Constitution, as does our constitution, provides separate methods for its revision and its amendment. *Id.* at 332-334.

The *McFadden* court noted that in *Livermore v Waite*, 102 Cal 113; 36 P 424 (1894), the court had previously held that the establishment of a specific procedure for revising the constitution (by way of constitutional convention) precluded the idea that the framers of the constitu-

---

§§ 1, 2, and 4. Second, the fact that the voters had already approved the amendment in the general election did not affect the Supreme Court's analysis in *Pontiac School Dist.* As a result, our reliance on *Pontiac School Dist* is appropriate.

[4] As the Attorney General notes in his brief as amicus curiae, the measure purported to add only one new article to the California Constitution, but contained 12 separate sections, 208 subsections, and more than 21,000 words. *McFadden, supra* at 334. In contrast, the California Constitution at the time contained 25 articles, composed of 347 sections and 55,000 words. *Id.* Moreover, the measure contained a clause making it controlling over any conflicting provision in the existing California Constitution. *Id.* at 346.

tion intended to afford a means of effecting a revision by
way of the procedure established for amending the consti-
tution (legislative proposal). At one point, the court stated:

> "The very term 'constitution' implies an instrument of a
> permanent and abiding nature, and the provisions con-
> tained therein for its revision indicate the will of the people
> that the underlying principles upon which it rests, as well
> as the substantial entirety of the instrument, shall be of a
> like permanent and abiding nature. On the other hand, the
> significance of the term 'amendment' implies such an
> addition or change within the lines of the original instru-
> ment as will effect an improvement, or better carry out the
> purpose for which it was framed." [*McFadden, supra* at
> 333, quoting *Livermore, supra* at 118-119.]

The *McFadden* court then went on to state:

> It is thus clear that a revision of the Constitution may be
> accomplished only through ratification by the people of a
> revised constitution proposed by a convention called for
> that purpose as outlined hereinabove. Consequently if the
> scope of the proposed initiative measure (hereinafter
> termed "the measure") now before us is so broad that if
> such measure became law a substantial revision of our
> present state Constitution would be effected, then the
> measure may not properly be submitted to the electorate
> until and unless it is first agreed upon by a constitutional
> convention, and the writ sought by petitioner should issue.
> [*McFadden, supra* at 334.]

In determining whether the measure at issue was a
revision or an amendment, the *McFadden* court sum-
marized the content of the measure, stating:

> To recapitulate, at least 15 of the 25 articles contained
> in our present Constitution would be either repealed in
> their entirety or substantially altered by the measure, a
> minimum of four (five, if the civic center provision be
> deemed new) new topics would be treated, and the func-

tions of both the legislative and judicial branches of our state government would be substantially curtailed. [*Id.* at 345.]

The court then stated:

> Our review of the subjects covered by the measure and of its effect on the totality of our plan of government as now constituted does not purport to be exhaustive. It is amply sufficient, however, to demonstrate the wide and diverse range of subject matters proposed to be voted upon, and the revisional effect which it would necessarily have on our basic plan of government. The proposal is offered as a *single amendment* but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all. Such an appeal might well be proper in voting on a *revised* constitution, proposed under the safeguards provided for such a procedure, but it goes beyond the legitimate scope of a single amendatory article. [*Id.* at 345-346 (emphasis in original).]

The court specifically rejected the intervenors' argument that "if any less than all sections of the Constitution are altered, and if any less than all old sections are discarded, the change is merely an amendment." *Id.* at 347. The court stated:

> We cannot accept such an arbitrary and strained minimization of [the] difference between *amend* and *revise*. The differentiation required is not merely between two words; more accurately it is between two procedures and between their respective fields of application. Each procedure, if we follow elementary principles of statutory construction, must be understood to have a substantial field of applica-

tion, not to be (as argued in intervenors' Answering Memorandum) a mere alternative procedure in the same field. Each of the two words, then, must be understood to denote, respectively, not only a procedure but also a field of application appropriate to its procedure. The people of this state have spoken; they made it clear when they adopted article XVIII and made amendment relatively simple but provided the formidable bulwark of a constitutional convention as a protection against improvident or hasty (or any other) revision, that they understood that there was a real difference between amendment and revision. . . . Intervenors' contention—that any change less than a total one is but amendatory—would reduce to the rubble of absurdity the bulwark so carefully erected and preserved. Each situation involving the question of amendment, as contrasted with revision, of the Constitution must, we think, be resolved upon its own facts. A case might, conceivably, be presented where the question would be close and where there would be occasion to undertake to define with nicety the line of demarcation; but we have no such case or occasion here. [*Id.* at 347-348 (emphasis in original).]

The *McFadden* court ultimately concluded:

Applying the long established law to any tenable view of the facts which have been related, it is overwhelmingly certain that the measure now before us would constitute a revision of the Constitution rather than an amendment or "such an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purposes for which it was framed." Indeed, as has been shown in some detail, the effect of adoption of the measure proposed, rather than to "within the lines of the original instrument" constitute "an improvement or better carry out the purpose for which it was framed," would be to substantially alter the purpose and to attain objectives clearly beyond the lines of the Constitution as now cast. [*Id.* at 349-350 (citations omitted.]

After *McFadden*, California courts adopted a two-pronged test, consisting of both a qualitative and a

quantitative element, to determine whether a ballot initiative constituted an "amendment" versus a "revision" of the constitution. In *Raven v Deukmejian*, 52 Cal 3d 336, 342-343, 350-351; 801 P2d 1077; 276 Cal Rptr 326 (1990), the ballot initiative at issue sought to limit the rights of criminal defendants by mandating that California courts could not offer greater protections than those offered by the United States Supreme Court's interpretation of the federal constitution.

The initiative passed the quantitative prong of the test because it did not delete any of the language in the California Constitution and affected only a single article. *Id.* at 351. However, the court held that the initiative failed the qualitative prong of the test and constituted a revision because it sought far-reaching changes to the structure of the California judiciary by transferring its interpretive power concerning criminal defendants to the United States Supreme Court. *Id.* at 352-353. The court reasoned that the ballot initiative "substantially alter[ed] the substance and integrity of the state Constitution . . . ." *Id.* at 352. Therefore, it was not proper subject matter for a ballot proposal. See also *Brosnahan v Brown*, 32 Cal 3d 236, 259-261; 651 P2d 274; 186 Cal Rptr 30 (1982) (examining both the quantitative and qualitative effects of a proposal to determine if it constituted an "amendment" to or "revision" of the California Constitution).

Moreover, *McFadden* and its California progeny have formed the basis for the decisions of several other states that have considered the "revision" versus "amendment" issue in the context of modifying a state constitution. For example, in *Bess v Ulmer*, 985 P2d 979, 987 (Alas, 1999), the Supreme Court of Alaska stated that it "must consider both the quantity and quality of the proposed constitutional changes" and that the "core

determination is always the same: whether the changes are so significant as to create a need to consider the constitution as an organic whole." The Supreme Court of Alaska relied, in part, on decisions of the California Supreme Court, which held that

> an enactment which is so extensive in its provisions as to change directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also. [*Amador Valley Joint Union High School Dist v State Bd of Equalization*, 22 Cal 3d 208, 223; 583 P2d 1281; 149 Cal Rptr 239 (1978).]

Likewise, in *Opinion of the Justices*, 264 A2d 342, 346 (Del, 1970), the Supreme Court of Delaware considered an "amendment" to be " 'an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purpose for which it was framed' " and a "revision" to make "extensive alterations in the basic plan and substance of the existing document" and attain "objectives and purposes beyond the lines of the present Constitution." (Citations omitted.) See also *Martinez v Kulongoski*, 220 Or App 142, 149-150; 185 P3d 498 (2008) (holding that "the distinction between a 'revision' and an 'amendment' " "can properly involve quantitative and qualitative considerations" and that changes can be "so 'fundamental' and 'far reaching' as to effect a 'revision' ") (citation omitted). The upshot of *McFadden* and these out-of-state decisions is that the distinction between a revision and an amendment depends on both the quantitative *and* the qualitative nature of the proposed changes to a constitution.

We agree with the reasoning of these decisions and find them to be consistent with Michigan law as stated

in *Laing* and *Pontiac School Dist.* Consequently, we hold that in order to determine whether a proposal effects a "general revision" of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider both the quantitative nature and the qualitative nature of the proposed changes. More specifically, the determination depends on not only the number of proposed changes, or whether a wholly new constitution is being offered, but on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government.

#### (d) APPLICATION

We recognize that it is not possible to "define with nicety the line of demarcation" between an "amendment" and a "general revision." *McFadden, supra* at 348. But, as in *McFadden*, "we have no such case or occasion here" that requires us to do so. *Id.* After evaluating the quantitative and the qualitative nature of the changes the RMGN initiative petition proposes, we hold that the proposal does not even approach the "field of application" for the amendment procedure. *Id.* at 347. Instead, the proposal plainly falls within the realm of a "general revision" of the constitution.

In particular, the RMGN initiative petition modifies §§ 1, 4, 7, and 9 of article 2; §§ 2, 3, 4, 5, 6, 7, 10, 12, 17, and 52 of article 4; §§ 2, 3, and 21 of article 5; and §§ 2, 3, 8, 11, 18, 19, and 30 of article 6, and would add §§ 55 and 56 to article 4, § 31 to article 5, and § 31 to article 6.

Looked at quantitatively, the proposal affects four articles of the constitution, modifies 24 current sections of the constitution, and adds four new sections to the constitution. Clearly, the number of proposed changes

and the proportion of current articles and sections affected by those proposed changes are very significant.

From a qualitative standpoint, the scope of the proposed changes is expansive. In the words of *McFadden*, the proposal "obviously is multifarious." *McFadden*, *supra* at 346. The proposal touches on a wide and diverse range of subjects, from the number of executive departments, legislators, and judges to absentee ballots, jury lists, lobbying activities, public disclosure of records, retirement and pension benefits, legislative districting, and standing to bring lawsuits. Also, the impact of the proposal on the operation of the three branches of government, and the electoral process, is substantial. As just one example, the proposal strips the Legislature of any authority to propose and enact a legislative redistricting plan. It abrogates a portion of the judicial power by giving a new executive branch redistricting commission authority to conduct legislative redistricting. It then removes from the judicial branch the power of judicial review over the new commission's actions. We agree with the Attorney General that the proposal affects the "foundation power" of government by "wresting from" the legislative branch and the judicial branch any authority over redistricting and consolidating that power in the executive branch, albeit in a new independent agency with plenary authority over redistricting.

We have thoroughly reviewed the number, scope, breadth, and impact of the petition's changes to the fundamental governmental structure that our current constitution creates and allows. We are further cognizant of the abruptness with which some of the changes are to be made. For example, the reduction in the number of justices of the Supreme Court and the number of Court of Appeals judges is to be implemented

on December 20, 2008, and the reduction in the number of departments, boards, and commissions, and the establishment of the judicial performance commission, are to be made by April 2009. In addition, the proposal requires the convening of the new commission on legislative districting and the completion of the commission's work within months of the effective date of the proposal.

We conclude, in light of these factors, that the modification of, and interference with, the operation of government is so far-reaching and so substantial that, considering both the quantitative and the qualitative nature of the proposed changes, the RMGN initiative petition effects a "general revision" of, and not simply an "amendment" to, the constitution. The substantial entirety of the petition alters the core, fundamental underpinnings of the constitution, amounting to a wholesale revision, not a mere amendment.

Therefore, we conclude that the power of initiative established by Const 1963, art 12, § 2, for amending the constitution does not extend to the RMGN initiative petition. In light of our "threshold determination" that the RMGN initiative petition does not meet the constitutional prerequisites for acceptance, the Board and the Secretary now have a clear legal duty to reject the petition. Consequently, we grant the relief sought in the complaint for mandamus and preclude the proposal from being placed on the ballot.

### (2) MULTIPLE PURPOSES

In light of our conclusion that the RMGN initiative petition does not meet the constitutional prerequisites for acceptance because the proposal at issue amounts to a "general revision" of the constitution, we need not make a "threshold determination" about whether the proposal also fails to meet the constitutional prerequi-

sites for acceptance because it serves more than one purpose. Consequently, we offer no opinion on whether a proposal submitted under the initiative petition procedure established by Const 1963, art 12, § 2, must embrace only a single purpose or whether the RMGN initiative petition would violate such a requirement.

### IV. CONCLUSION

The RMGN initiative petition is overarching, of a reach and expanse never before seen in any constitutional initiative in Michigan's long history. It proposes fundamentally to redesign the very framework of the Michigan Constitution of 1963, which emerged after an historic convention and subsequent voter approval. The issue is not whether the motivation for the proposed changes is altruistic or parochial. And the issue is not whether any one, or several, or all of the proposals in the RMGN initiative petition are warranted or make sound public policy. The issue is that our present constitution contains specific language requiring that any proposal of the magnitude and enormity of the RMGN initiative petition be submitted to a constitutional convention, and then to the citizens for approval. We may not blithely ignore or conveniently overlook Const 1963, art 12, § 3, requiring a constitutional convention for any "general revision." The Michigan Constitution has transcended, and will continue to transcend, the lifetime of any single constituency, and it demands no less than a rigorous application of its prescribed methods for modification.

We grant the relief sought in the complaint for a writ of mandamus.

No costs, a public question being involved. We retain jurisdiction. This opinion is to have immediate effect, MCR 7.215(F)(2).