Viviano, J.
**54 The question in this case is whether the voter-initiated amendment proposed by intervening defendant Voters Not Politicians (VNP) should be placed on the ballot. VNP launched a petition drive to propose an amendment that would reestablish a commission to oversee legislative redistricting. Plaintiffs brought suit to stop the petition from being placed on the ballot, making the now familiar argument that the proposed amendment is actually a "general revision" that can only be enacted through a constitutional convention.
We took this case to determine whether the VNP petition is a constitutionally permissible voter-initiated amendment under Const 1963, art 12, § 2. To answer this question, we must fulfill our Court's most solemn responsibility: to interpret and apply the pertinent provisions of our Constitution. After closely examining the text, structure, and history of the Constitution, we hold that, to be permissible, a voter-initiated amendment must propose changes that do not significantly alter or abolish the form or structure of the government in a manner equivalent to creating a new constitution. We reach this conclusion for the following reasons:
**55 • The text of the relevant constitutional provisions, Const 1963, art 12, §§ 2 and 3, makes it clear that a constitutional convention is required to produce a new constitution. (See pages 20 through 31 of this opinion.)
• The primary substantive limitation in the text of the predecessor provision to Const 1963, art 12, § 2 originally imposed on voter-initiated amendments was removed more than 100 years ago. (See pages 20 through 22 of this opinion.)
• Our caselaw on this topic-undeveloped and largely not on point-fails to establish any controlling standard in this area. (See pages 12 through 19 of this opinion.)
In this case, VNP's amendment does not propose changes creating the equivalent of a new constitution:
• VNP's proposed redistricting commission is materially similar to the commission provided for in our current *250 Constitution, and VNP's proposed redistricting standards are similar to the ones presently used. (See pages 38 through 44 of this opinion.)
• VNP's proposal does not substantially change the powers of the three branches of government when compared to where the people placed those powers in the 1963 Constitution. (See pages 44 through 50 of this opinion.)
• Finally, treating VNP's proposal as an amendment accords with the stated expectations of key delegates to the 1961-1962 constitutional convention, statements from this Court on this very topic, and the treatment of this issue by other states. (See pages 50 through 55 of this opinion.)
Therefore, we affirm the judgment of the Court of Appeals that VNP's proposal is a permissible voter-initiated amendment.
**56 I. FACTS AND PROCEDURAL HISTORY
VNP is a ballot-question committee. It filed with defendant Secretary of State the initiative petition at issue in this case. The initiative proposal would, among other things, amend Const 1963, art 4, § 6, which established a commission to regulate legislative redistricting. The commission prescribed by our present Constitution is inactive because this Court declared that it could not be severed from apportionment standards contained in the Michigan Constitution that had been held to be unconstitutional, as explained further below.[1] After that ruling, this Court oversaw redistricting until the Legislature took control of the process. VNP's proposal would bring Michigan's constitutional redistricting standards in line with federal constitutional requirements and revive the redistricting commission's authority to set redistricting plans for the state house, state senate, and federal congressional districts.
A sufficient number of registered electors signed the petition for it to be placed on the November 2018 general election ballot. Before the Board of State Canvassers could certify the petition for placement on the ballot,[2] plaintiff Citizens Protecting Michigan's Constitution (CPMC), along with other plaintiffs,[3] filed the present complaint for a writ of mandamus directing the Secretary of State and the Board to reject the VNP proposal. CPMC argued that the proposal was not an amendment of the Constitution that could be proposed by petition under Const 1963, art 12, § 2 ; rather, the **57 proposal amounted to a "general revision" of the Constitution and could be enacted only through a constitutional convention under Const 1963, art 12, § 3. The Court of Appeals granted the request by VNP and other parties[4] to intervene as defendants and to file a cross-complaint seeking a writ of mandamus requiring the proposal to be placed on the ballot.
In a unanimous published opinion, the Court of Appeals rejected plaintiffs' requested relief and granted the relief sought by intervening defendants, ordering the Secretary of State and the Board "to take all necessary measures to place the proposal on the November 2018 general *251 election ballot."[5] The Court noted that our courts have long distinguished between an "amendment" and a "revision."[6] The former was a narrower concept focusing on specific changes to the Constitution, while the latter was a more comprehensive modification of fundamental government operations.[7] To determine if a particular proposal changed the fundamental nature of the government, the Court of Appeals considered the quantitative and qualitative features of the proposal.[8]
Comparing the present proposal to those addressed in past cases, the Court observed that the proposal **58 would continue, with modifications, the redistricting commission already in the Constitution (although not enforced).[9] Also, the proposal "involve[d] a single, narrow focus-the independent citizen redistricting commission."[10] While the proposal reduced this Court's oversight of redistricting plans from the level contemplated by the present Constitution, our Court would nonetheless retain control over challenges to redistricting plans.[11] Regarding quantitative considerations, the Court of Appeals noted the number of words the proposal would add to the Constitution (4,834) and the fact that 11 sections would be changed across 3 articles of the Constitution.[12] None of this, however, was enough to convince the Court that fundamental government operations would be altered. Thus, the proposal was an amendment that could be brought by petition, as it had been.
CPMC sought leave to appeal here and requested a stay of proceedings below so that the Board would not certify the proposal while the case remained pending. We denied the motion for a stay,[13] but we granted leave to appeal to consider "whether the proposal at issue is eligible for placement on the November 2018 general election ballot as a voter-initiated constitutional amendment under Const 1963, art 12, § 2, or whether it is a revision to the Constitution and therefore is ineligible for placement on the ballot."[14]
**59 II. STANDARD OF REVIEW
A lower court's decision on whether to grant a writ of mandamus is reviewed for an abuse of discretion.[15] To the extent that a request for a writ of *252 mandamus involves questions of law, we review them de novo.[16]
III. ANALYSIS
A. CONSTITUTIONAL INTERPRETATION
Our Constitution is clear that "[a]ll political power is inherent in the people."[17] The people have chosen to retain for themselves, in Const 1963, art 12, § 2, the power to initiate proposed constitutional amendments that, if various requirements are met, will be placed on the ballot and voted on at election time. It has been observed that "there is no more constitutionally significant event than when the wielders of '[a]ll political power' under that document, Const 1963, art 1, § 1, choose to exercise their extraordinary authority to directly approve or disapprove of an amendment thereto. Const 1963, art 12, §§ 1 and 2."[18] In this case, we must determine the scope of the voters' power to initiate amendments.
**60 In answering this question, we do not consider whether the proposed amendment at issue represents good or bad public policy.[19] Instead, we must determine whether the amendment meets all the relevant constitutional requirements.[20] There may be an "overarching right" to the initiative petition, "but only in accordance with the standards of the constitution; otherwise, there is an 'overarching right' to have public policy determined by a majority of the people's democratically elected representatives."[21] In particular, we have stated that the "right [of electors to propose amendments] is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution."[22]
*253 Our inquiry here, then, is to determine the extent of the people's right to initiate constitutional amendments and whether any clear limitations may be found **61 in the Constitution.[23] As with any constitutional provision, the objective of our interpretation " 'is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.' "[24] The primary rule is that of " 'common understanding,' " as Justice COOLEY explained long ago:
A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed."[25 ]
To help discover the "common understanding," this Court has observed "that 'constitutional convention debates and the address to the people, though not controlling, are relevant.' "[26]
**62 B. OVERVIEW OF THE AMENDMENT AND REVISION PROCESS
Three basic procedures allow for alterations of the Constitution. The first, not directly relevant here, provides for "amendments" proposed in the Senate or House and approved by two-thirds of the members in each chamber, then submitted to the voters for approval.[27] Const 1963, art 12, § 2 provides the second manner of altering the Constitution, which is the one VNP attempted here: "Amendments may be proposed to this constitution by petition of the registered electors of this state."[28] "Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast" for Governor in the most recent general gubernatorial election.[29] Once the "person authorized by law to receive such petition" determines that the petition signatures *254 were valid and sufficient, the proposed amendment is placed on the ballot.[30] Finally, under Const 1963, art 12, § 3, the third manner of changing the Constitution is by constitutional convention.[31] Every 16 years, "and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state"; if the voters vote in favor of performing a "general revision," a constitutional convention is convened for that purpose.[32]
We have explained that the adoption of the initiative power, along with other tools of direct democracy, **63 "reflected the popular distrust of the Legislative branch of our state government."[33] While the right to propose amendments by initiative must be done according to constitutional requirements, we have observed that "it may be said, generally, that [the right] can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises."[34] Indeed, we have held that Article 12, § 2 is self-executing,[35] although the Constitution explicitly allows the Legislature to prescribe by law procedures regulating the initiative.[36]
C. LIMITATIONS ON VOTER-INITIATED AMENDMENTS
The scope of the initiative amendment process and its relation to the "general revision" process is at the **64 heart of this case. How extensive can a voter-initiated amendment be, and does the Constitution place any relevant subject matter limitations on such amendments?
1. CASELAW
We will begin with our caselaw on this topic, which ultimately proves unilluminating. There is no controlling authority from this Court construing the meaning of the term "amendment" in Article 12, § 2. The issue has been raised twice in the last 10 years, but neither case yielded a majority opinion from this Court construing the term "amendment" in this context. In Citizens ,[37] the Court of Appeals addressed this issue for the first time. In that case, a group called Reform Michigan Government Now! (RMGN) submitted an initiative *255 petition proposing a vast array of changes to Michigan's Constitution.[38] CPMC argued that "the RMGN initiative petition [was] not eligible to be placed on the ballot because it [was] not merely an 'amendment' to the constitution, but [was] a 'general revision' ... that only a constitutional convention [could] accomplish."[39] The Court distinguished an "amendment" from a "general revision" and held:
[I]n order to determine whether a proposal effects a "general revision" of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider both the quantitative nature and the qualitative nature of the proposed **65 changes. More specifically, the determination depends on not only the number of proposed changes or whether a wholly new constitution is being offered, but on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government.[40 ]
In reaching this conclusion, the court reviewed: (1) the text of the constitutional provisions at issue;[41] (2) two cases from this Court-one interpreting a city charter under the Home Rule City Act, MCL 117.1 et seq .,[42] and one interpreting the predecessor provisions of the 1908 Michigan Constitution;[43] and (3) several cases from other jurisdictions, including two leading cases decided by the California Supreme Court.[44] The Court "agree[d] with the reasoning of these decisions" and found them "to be consistent with Michigan law as stated in Laing and Pontiac School Dist ."[45]
Much of the Court of Appeals' analysis hinged on Laing and Pontiac Sch. Dist. , so it is worth considering whether those cases did, in fact, establish the above standard, and whether they are binding or persuasive authority. Despite the Court of Appeals' reliance on Laing and Pontiac Sch. Dist. , we find these cases to be of limited value on this topic. Laing is clearly distinguishable **66 because, while it addressed the distinction between a "revision" and an "amendment," it did so in the context of a city charter under the Home Rule City Act.[46] And, in any event, its discussion was unnecessary to resolving the case, since it occurred immediately after the Court's holding that "[t]he petition on its face is not in the form required by law, and raised no duty in defendants to provide for an election."[47] We agree with the Solicitor General that this case is not binding; however, *256 the Court's opinion does give some insight into the plain meaning of the terms "amendment" and "revision" 24 years after the 1908 Constitution was ratified:
"Revision" and "amendment" have the common characteristics of working changes in the charter and are sometimes used inexactly, but there is an essential difference between them. Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose. Basically, revision suggests fundamental change, while amendment is a correction of detail.[48 ]
**67 Nine months later, in Pontiac Sch. Dist. , this Court again addressed the distinction between an "amendment" and a "revision," this time in the context of a challenge to an amendment of the Constitution proposed under Article 17, § 2 of the 1908 Constitution, the predecessor to Article 12, § 2 of the 1963 Constitution.[49] Without any discussion of the text of the provision, or citation of any authority (notably absent was any citation of Laing , decided less than a year earlier), the Court summarily rejected the argument that the amendment amounted to a revision because it "does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment by way of an addition to the Constitution."[50] It is hard to glean much meaning from this statement, since the Court did not purport to set forth a standard to govern this question but instead merely rejected the argument in the form that it was presented. Notably, the distinction between an amendment and a revision was contained only in the parties' arguments to the Court; speaking for itself, the Court did not actually embrace a dichotomy between "amendments" and "revisions" but simply concluded that the proposal was not so dramatic a change as to "render it other than an amendment ...."[51]
In Citizens , this Court had an opportunity to resolve the case under the amendment/revision dichotomy but declined to do so, affirming the result only and fracturing on the reasoning. Three justices gave a qualified endorsement of the Court of Appeals' articulation of the distinction between an "amendment" and a "general **68 revision" of the Constitution.[52] The remaining four justices declined to adopt the *257 Court of Appeals' standard. Three of the four agreed with the order affirming, but did so based on grounds not addressed by the Court of Appeals, namely, that "a proposal of this extraordinary scope and multitude of unrelated provisions clearly cannot be reasonably communicated to the people in 'not more than 100 words,' " as required by Article 12, § 2.[53] By its willingness to dispose of the case on the alternative ground that "[t]his language establishes a clear limitation on the scope of the constitutional amendments under [ Article 12, § 2 ],"[54] the statement by this grouping of justices may be read as an implicit recognition that the "amendment/general revision" dichotomy did not provide such a clear limitation, at least not under the Court of Appeals' standard.[55] Justice KELLY 's dissent questioned the test developed by the Court of Appeals and lamented that our failure to construct a clearer test left the state of the law unsettled.[56] **69 The Court of Appeals again confronted this issue in Protect Our Jobs v. Bd. of State Canvassers .[57] As the Court summarized it, the ballot proposal at issue was narrow, providing in one constitutional section the "people with the right to organize and bargain collectively" with public and private employers, to the extent not preempted by federal law, and in another section "protecting the rights of classified civil service employees to bargain collectively concerning all conditions and aspects of employment except promotions."[58] CPMC challenged the proposal on the same grounds it asserted in Citizens and is asserting in this lawsuit, i.e., that it was a general revision of the Constitution under Article 12, § 3.
The Court of Appeals rejected CPMC's challenge, using the "qualitative and quantitative" standard from its decision in Citizens and concluding that although the proposal might affect "various provisions and statutes," it was "limited to a single subject matter" and changed only two sections of the Constitution.[59] By contrast, the RMGN proposal in Citizens
sought to replace vast portions of the constitution and massively modify the structure and operation of Michigan's government. The initiative proposal here is far more akin to a correction of detail than a fundamental change, when viewed in the proper context of the constitution as a whole. See Kelly v. Laing , 259 Mich. 212, 217, 242 N.W. 891 (1932).[60 ]
*258 **70 This Court did not order briefing on the issue[61] and our opinion declined to address it.[62]
Thus, we could locate no controlling authority from this Court construing the meaning of the term "amendment" in Article 12, § 2. At most, Pontiac suggests there may be undefined limitations on what can be achieved by an amendment. Moreover, our caselaw lacks a detailed examination of this issue, especially one that conducts the proper analysis by examining the constitutional text. Perhaps as a result of veering from the text, the rather vague standard that has developed below affords courts considerable discretion in this area.[63] We believe the constitutional text provides a clearer standard, which we turn to now.
**71 2. ARTICLE 12, § 2
The textual analysis begins with examining the meaning of "amendment" as used *259 in the text.[64] "Amendment" is relevantly defined as "an alteration of a legislative or deliberative act or in a constitution; a change made in a law, either by way of correction or addition," or "the correction of an error in a writ, record, or other judicial document."[65] The definition does not directly speak to the breadth of the change **72 that can be made by amendment or provide any substantive limitations on amendments.
With regard to limitations on the scope of amendments, the text of the predecessor provision to Article 12, § 2 was meaningfully changed soon after its ratification in 1908. When it was ratified, the Constitution gave the Legislature a veto over voter-initiated amendments before the election at which the proposal would appear on the ballot, and the Legislature could also submit alternative or substitute amendments.[66] Yet despite the Legislature's considerable oversight, the framers of the Constitution nonetheless thought that "the effect of this provision [i.e., the initiative provision] will be the submission to a vote of the electors of **73 practically all amendments petitioned for."[67] In a telling passage of the Address to the People, the framers explained that legislative oversight of the amendments proposed by initiative was a crucial factor to the convention:
The convention realized the far-reaching effect that each amendment to the constitution may have beyond the immediate purpose intended by it, and it was deemed essential in so important a matter as changing the fundamental law of the state that the very greatest care should be required in both the form and substance of amendments to it. Such care is secured by requiring the amendments proposed to pass the scrutiny of the legislature .[68 ]
But even the legislative veto-the clearest and most significant substantive check on *260 the petition power-was deleted by amendment in 1913.[69] In light of this history, we should be wary of finding a textual limitations on voter-initiated amendments.
The critical limitation in Article 12, § 2-at least based on the amount of discussion it prompted at the 1961-1962 convention-is instead the procedural requirement of obtaining a certain number of signatures. Originally, signatures in a number equal to 20 percent of the vote at the most recent election for secretary of state had to be collected, but in 1913 this threshold was reduced to 10 percent of the votes for Governor at the **74 most recent general gubernatorial election.[70] The importance of this restriction in the constitutional framework was made abundantly clear by the framers of the 1963 Constitution, who engaged in a spirited debate regarding the signature requirement. At the convention, it was proposed, and briefly added to the constitution under consideration, that the 10 percent requirement be amended to include "or 300,000 such registered electors, whichever shall be less."[71] The effect would have been to make it progressively easier to obtain enough signatures as the population increased. Delegate J. Harold Stevens successfully recommended striking this addition, arguing that the voter-initiated amendments should not be too easy to accomplish.[72] But his concern reflected his belief that initiative amendments should not be akin to "statutory matter."[73] He did not want to debase the Constitution by cluttering it with trivial amendments-in other words, he wanted amendments to be important enough to merit inclusion in a constitution. He was not, then, suggesting that initiative amendments should be limited to trivial matters; quite the contrary.[74] **75 Thus, the convention decided to keep voter-initiated amendments difficult because amendments, like the Constitution itself, were intended to deal with serious matters. The convention accomplished its goal by imposing what it viewed as the clearest and most stringent limitation on initiative amendments: a signature requirement.[75] *261 3. ARTICLE 12, §§ 2 AND 3 : THE NEW-CONSTITUTION TEST
The relevant substantive limitation on the scope of voter-initiated amendments arises from the text of Article 12, § 2 when read together with Article 12, § 3. By adopting these two different procedures for altering the Constitution, the framers intended that the mechanisms must be different in some regard. As one treatise similarly observed in 1910:
It may be argued ... that if a constitution specifically provides two methods of alteration, the language employed with reference to the proposal of amendments by the legislative method may, when read with that concerning the convention method, often be construed as an implied prohibition of complete constitutional revision by the legislative method.[76 ]
**76 In other words, the distinction between changes proposed by amendments and changes proposed by a convention indicates a substantive difference that limits the breadth of amendments.
Our Constitution tells us what this basic difference is. The result of a constitutional convention called to consider a "general revision" is a "proposed constitution or amendments" adopted by the convention and proposed to the electors.[77] The convention, then, can propose amendments to the existing Constitution or offer a new constitution.[78] By contrast, if approved, a *262 **77 voter-initiated amendment under Article 12, § 2"shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution ...."[79] Consequently, an amendment does not replace a constitution in full, but simply adds to or abrogates specific provisions in an existing constitution.[80] Thus, the constitutional text distinguishes between amendments that can be made by petition and new "constitutions." Because only the convention has the power to propose a constitution, by logical implication an initiative amendment cannot do so. And since this limitation would be meaningless if it only required a new constitution to be labeled as an amendment, it follows that an initiative amendment cannot propose changes that are tantamount to the creation of a new constitution.[81] **78 The phrase "general revision" supports this dichotomy between amendments and "new" constitutions, although the phrase has engendered some confusion. The "purpose" of a convention is to consider "the question of a general revision of the constitution ...."[82] "General" means "dealing with all or the overall, universal aspects of the subject under consideration ...."[83] "Revision," in turn, is relevantly defined as "the act or work of revising."[84] *263 This is how we **79 characterized the term in Laing[85] and how it was described at the 1908 convention: "What is meant by revision or to revise? Why simply to re-examine for the purpose of correction-the act of reviewing or re-examination for the purpose of correction."[86] The "revision" is simply the process for reconsidering the constitution as a whole. It is not, as some Court of Appeals opinions suggest,[87] a particular document or proposed change. Thus a "revision" is not contradistinguished from an "amendment." Rather, as noted, the distinction between the Article 12, § 3 convention process and the Article 12, § 2 amendment process is that the former can produce a proposed constitution, while the latter is limited to proposing less sweeping changes.[88] **80 Having determined that the relevant substantive limitation is that a voter-initiated amendment cannot be equivalent to a new constitution, we must determine what this limitation entails. As an initial matter, the number of changes is not dispositive, as even a limited number of changes can have the effect of creating a new constitution.[89] A constitution, after all, is more *264 than words on a page. Its most basic functions are to create the form and structure of government, define and limit the powers of government, and provide for the protection of rights and liberties.[90] These are **81 the basic threads of a constitution, and when they are removed, replaced, or radically rewoven, the whole tapestry of the constitution may change.
Therefore, changes that significantly alter or abolish the form or structure of our government, in a manner equivalent to creating a new constitution, are not amendments under Article 12, § 2.[91] Contrary to the suggestion in Pontiac Sch. Dist. ,[92] it is not necessarily the impact on the operations of government that matters-like the United States Supreme Court, we decline to accept "the narrow-minded assumption" that the only purpose of our constitutional provisions "is to make the government run as efficiently as possible."[93] Further, a change that recalibrates the relative power **82 of the branches of government-such as limiting or taking away a specific power from one branch-is not, absent a significant effect on the structure of government, a change that is tantamount to the creation of a new constitution.[94] Indeed, we have stated that, despite its eliminating power from the judiciary *265 or executive branch, an amendment permitting indeterminate criminal sentences was "the people['s] exercise[ ] [of] a right inherent in them to adopt a constitutional amendment taking away from, or adding to, the powers of either of the departments of government."[95] In fact, it would be difficult to imagine many amendments that leave the proportionate powers of the branches completely unchanged.[96]
IV. APPLICATION
Given the above analysis, VNP's proposal will be considered a permissible amendment if it does not propose changes that significantly alter or abolish the form or structure of our government in a way that is tantamount to creating a new constitution. To answer this question, we must examine our current law on redistricting and apportionment and how VNP's proposal would change that law.
**83 A. APPORTIONMENT AND REDISTRICTING
Under our first three Constitutions, the Legislature was granted authority to redistrict.[97] But the Legislature did not always carry out this responsibility.[98] In light of this history, two competing voter-initiated amendments to the then-existing Constitution were placed on the November 1952 ballot.[99] One was approved, which wrote directly into the Constitution the then-existing alignment of seats in the Senate provided for in the 1952 amendment, added 10 seats to the House, and conferred upon the Board of State Canvassers the obligation to draw up new house districts if the Legislature failed to act.[100]
Our present Constitution, as ratified by the voters in 1963, laid out a different framework for reapportionment and redistricting, although for reasons that will become clear below, it is not currently followed.[101]
**84 Under the Constitution, "the 38 *266 members of Michigan's senate and the 110 members of the house of representatives are elected according to the district in which they reside. The Constitution sets forth the apportionment factors and rules for individual districts, which are redrawn after" the federal census is published.[102] The Constitution aligns the senate districts with counties and apportions senators based on "factors" consisting of percentages of the county's population and "land area" in the state.[103] The house districts were based on counties and apportioned according to population.[104] In other words, the apportionment was based on "weighted land area/population formulae."[105]
A key innovation of the 1963 Constitution was to create a bipartisan "commission on legislative apportionment" to draw the relevant district lines.[106] The commission consisted of eight seats, with the major political parties each entitled to appoint four members.[107] The Secretary of State was the commission's nonvoting secretary, required to furnish "all necessary technical services," and the Legislature was required to "appropriate funds to enable the commission to carry out its activities."[108] The commission was required **85 to "hold public hearings as may be provided by law."[109] The commission had to complete its work within 180 days of the census data becoming available.[110] Each final apportionment and districting plan adopted by the commission had to be published and would become law 60 days after publication.[111] If the commission could not agree on a plan, commissioners could submit plans to our Court, which was required to "determine which plan complies most accurately with the constitutional requirements" and direct that the plan be adopted.[112] The Court was also given jurisdiction over any application filed by electors within 60 days of publication of the plan.[113]
As our present Constitution was being deliberated at the 1961-1962 constitutional convention, the United States Supreme Court was also considering constitutional challenges to apportionment schemes. In 1962, that Court held that challenges to apportionment plans were justiciable, setting the stage for vast changes in this area of law.[114] Two years later, in Reynolds v. Sims , the Court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."[115] Geographical considerations, such as apportionment based on counties, could no longer play a role in apportionment if they **86 produced population deviations between *267 the districts.[116] One week after Reynolds was decided, the United States Supreme Court peremptorily reversed a federal district court's earlier judgment that Michigan's apportionment rules were constitutional, which invalidated them.[117]
Days after Reynolds was decided, we ordered the commission to adopt a new plan for redistricting and apportionment that complied with the Supreme Court's decisions in Reynolds and various related cases decided the same day.[118] When the commission failed to reach an agreement, we issued an opinion directing it to adopt the so-called Austin-Kleiner Plan, as it most closely adhered to the new constitutional requirements.[119] In a concurrence, Justice SOURIS argued that the commission "was so dependent upon the continuing validity of the [now unconstitutional apportionment formula] by which the commission's duties were specified and expressly limited, that it could not survive alone."[120]
The apportionment issue was back before the Court in 1972 after the commission once again deadlocked **87 and invoked our supervision.[121] We ordered the adoption of a proposed apportionment plan, but did not comment on the viability of the commission.[122] Justice T. G. KAVANAGH dissented, reaching the same conclusion Justice SOURIS had in 1964: the commission could not exist-i.e., was not severable from-the unconstitutional apportionment standards in our Constitution.[123]
In 1982, with yet another deadlocked commission seeking our supervision, we adopted the position of Justices SOURIS and T. G. KAVANAGH by declaring that the commission was not severable from the unconstitutional apportionment provisions it was directed to implement.[124] We thought the commission was inseparable from the unconstitutional standards because holding otherwise would have required us to opine on whether the people would have voted for the commission without those standards.[125] Because the issue of changing how legislators are chosen is "a fundamental matter," we would not "speculate on a matter of such enormous importance."[126] Critically, we emphasized repeatedly that "[t]his is a decision which the people *268 should make."[127] It was a decision, we suggested, that the people could initiate through a constitutional amendment:
**88 The power to redistrict and reapportion the Legislature remains with the people. The people, however, can only exercise that power, as a practical matter, by amending the constitution, which, unless the Legislature proposes an amendment acceptable to the people, is a difficult and time-consuming process.[128 ]
Tellingly, we noted in the same discussion that "[t]he initiative process is also difficult and time-consuming."[129] Because that process was slow, and a plan needed to be formulated in the meantime, we appointed an individual to oversee the drawing of a redistricting and apportionment plan consistent with various principles we established.[130] We noted, however, that the Legislature could draw its own plan, which would supersede the one we set in motion.[131] But again, we stressed that our plan was merely a stopgap that would "stand until the people act, or it is changed by the collective action of the other two branches of this government, composed of persons who are the most immediate representatives of the people."[132] It was not until 1996 that the Legislature codified apportionment standards and committed itself to drawing districts in the future.[133]
Thus, the last time the voters had direct input on this issue, they opted for apportionment and redistricting to be conducted by a commission. The rules to be implemented by that commission have been declared unconstitutional, and we deactivated the commission by concluding **89 that it was not severable from those unconstitutional rules. The Legislature now exercises a power that the Constitution of 1963 expressly denied to it-to draw legislative districts-because our Constitution has never been amended to modify the unconstitutional provisions concerning apportionment and redistricting.
B. THE VNP PROPOSAL
That is precisely what VNP's constitutional amendment proposes to do. To accomplish this task, the proposal would eliminate the current language in the Constitution laying out the apportionment formulae.[134] Instead, seven criteria are proposed, requiring that the districts must, in order of priority: (1) have "equal population as mandated by the United States Constitution," (2) "be geographically contiguous," (3) "reflect the state's diverse population and communities of interest," (4) "not provide a disproportionate advantage to any political party," measured by "accepted measures of partisan fairness," (5) "not favor or disfavor an incumbent elected official," (6) "reflect consideration of county, city, and township boundaries," and (7) "be reasonably compact."[135]
Rather than rewriting the constitutional section governing the commission, the *269 VNP proposal simply deletes the language in Const 1963, art 4, § 6 establishing the commission.[136] In its place, the proposal offers a reformed commission that is similar to its **90 predecessor.[137] Like the old one, it consists of four members from each major political party, but it would have five additional members who are declared independent voters.[138] All 13 members would be selected from a pool of candidates who have submitted applications, taken oaths, and met various other requirements.[139] The leaders of both parties in the Senate and House can strike, in total, 20 names from the applicant pools.[140] The commission, once selected, must hold public hearings and its contact with the public is regulated in detail by the proposal.[141] A plan is adopted only with at least two votes from each subgroup (Republicans, Democrats, and independents), as well as a majority of the whole.[142]
The proposal continues nearly verbatim various ancillary provisions from the 1963 commission. The Secretary of State, for example, remains a nonvoting secretary of the commission, charged with providing the commission "all technical services that the commission deems necessary."[143] Likewise, the Legislature remains obligated to "appropriate funds" for the commission, although the proposal provides a detailed breakdown of what the funds go to, whereas the 1963 Constitution simply required the appropriation of sufficient funds "to enable the commission to carry out its activities."[144] Our Court has a similar, if perhaps narrower, **91 jurisdictional grant under the proposal: we can "direct the Secretary of State or the commission to perform their respective duties," and we may also "review a challenge to any plan adopted by the commission" and "shall remand a plan to the commission for further action if the plan fails to comply with the requirements of this Constitution, the Constitution of the United States or superseding federal law."[145] The proposal adds various provisions clarifying that the commission's power is legislative and not subject to the Legislature's[146] or the Governor's[147] control, and the vesting clauses of the judicial, executive, and legislative branches are amended so as to vest power in their respective branches "except to the extent limited or abrogated" by certain of the new provisions.[148]
C. ASSESSING THE PROPOSAL
To determine whether VNP's proposal is a permissible amendment, we must ask whether it significantly alters or abolishes the form or structure of our government in *270 a manner that is tantamount to creating a new constitution.[149] **93 One central feature of the VNP amendment is that it sweeps away unconstitutional provisions that have remained in the Constitution for some time. The "weighted land area/population formulae" and the accompanying apportionment factors[150] are gone, and so counties would not be the organizing feature of redistricting plans. But these changes involve no great transformation because these features were held unconstitutional 36 years ago. In their place our state has used federal constitutional requirements and various state "guidelines,"[151] enacted in 1996, including that the districts "[be] areas of convenient territory contiguous by land,"[152] "preserve *271 county lines with the least cost to the principle of equality of population,"[153] and remain as compact as possible when drawn within a city or township with multiple districts.[154] VNP's proposed standards reflect many of the same principles, including, of course, adhering to federal law, and also requiring contiguous districts, respecting municipal boundaries, and seeking reasonable compactness.[155] The proposal contains a few new items too, such as considerations of partisan fairness. But given their continuities with the current standards, VNP's proposed standards are no revolution in redistricting, and they certainly do not portend a transformation of our form or structure of government. **94 As noted above, various provisions in VNP's proposal mirror those in the current Constitution. The Secretary of State has substantially the same general responsibilities, being the nonvoting secretary of the commission responsible for furnishing its needs.[156] The Secretary of State has more detailed obligations under the proposal, involving the formation of the commission.[157] But these tasks are ministerial and in line with our current Constitution-requiring the Secretary of State to manage applications or other records is business as usual, not a new way of governing Michigan.[158]
Since plaintiffs and the Chief Justice's dissent concede that "the people can alter the power of redistricting by amending the Constitution,"[159] the more significant argument against the VNP proposal is that it disrupts the separation of powers. The powers are most glaringly reconfigured, according to plaintiffs, by the proposal's inclusion of limiting language in the vesting clauses of each branch. The legislative, executive, and judicial branches are given their respective powers "except to the extent limited or abrogated" by certain parts of the proposal.[160] The dissent takes the position that these changes "fundamentally change the operation **95 of our government" by limiting the vested powers of the branches and creating a new commission with responsibility for redistricting.[161] We disagree.
The limitations in the vesting clauses are, in many ways, the result of VNP's attempt to comply with other requirements in Article 12, § 2. By including this language, the proposal simply seeks to harmonize its changes with the rest of the Constitution. This is important because Article 12, § 2 requires that the proposal republish for the voters any portion of the *272 present Constitution that the proposed amendments would alter or abrogate.[162] This requirement has kept at least one proposal off the ballot in the recent past.[163] By explicitly adding limitations to the vesting clauses here, VNP sought to avoid any argument that it was implicitly altering or abrogating the vesting clauses or other parts of the Constitution. More broadly, by adding this language, the proposal makes explicit what would have been implicit without the language-the proposal does have some effect on the responsibilities and powers of the branches of government. But the proposed language in the vesting clauses tells us nothing useful to the critical inquiry: just how significant are the changes? The proposal is in jeopardy only if the changes are equivalent to the creation of a new constitution. To answer that question, we have to examine the proposed changes that affect the branches' relative powers.
To begin, consider how the proposal would change the present Constitution with regard to the Legislature.
**96 The present Constitution does not accord the Legislature any role in the redistricting or apportionment process. Instead, like VNP's proposal, a commission is placed in charge. The commissions are materially similar. Both are charged with drawing a redistricting plan based on various guidelines. And while the guidelines have changed, as explained above, VNP's proposal actually reflects many of the same standards currently used. The major difference between the 1963 Constitution's commission and VNP's is the process by which commission members are chosen. VNP's proposal is undoubtedly more elaborate on this point. Nonetheless, as with the old commission, VNP's proposal seeks to ensure that the membership strikes a partisan balance. In fact, in doing so, VNP's proposal gives the Legislature a formal role in the process, with the majority and minority leaders of each house entitled to a certain number of vetoes on members.[164] The Legislature has no such role in the 1963 Constitution's commission. If anything, then, VNP's proposal increases, slightly, the Legislature's participation in the process over the level contemplated in 1963. And the Legislature's new, minor role does not come at the expense of either of the other two branches, which have no real part in this process.
Of course, we are not oblivious to the fact that the Legislature, since 1996, has established the standards and framework for redistricting, as well as drafted the plans.[165] But the current state of affairs is a deviation from what the voters chose when they ratified the 1963 **97 Constitution.[166] Under the 1963 Constitution, the *273 power to draw districts never belonged to the Legislature. Rather, its present role is solely due to a judicial remedy we crafted in light of our conclusion that the unconstitutional apportionment standards the commission was directed to implement could not be severed from the commission itself.[167] Nothing about the commission was intrinsically unconstitutional. Thus, to the extent that the Legislature's power is being diminished, that power had not been granted by the **98 people through the Constitution. If anything, VNP's proposal is an attempt to correct the constitutional deficiencies so that the basic design of the 1963 Constitution-which created an independent redistricting commission-can be implemented. We cannot reasonably conclude that this effort to revivify and improve upon a feature of the present Constitution amounts to a substantial alteration in the form or structure of our government.[168]
The executive branch is not significantly affected by the proposal. Under the 1963 Constitution, the executive played no role in redistricting except for the Secretary of State's various responsibilities. Those would expand under VNP's proposal, as noted above, but not in any material respect. VNP's proposal neither adds to nor subtracts from any other responsibilities or powers of the executive branch compared to its position under the present Constitution. Any additional powers the executive might currently have-such as a veto over the Legislature's statutorily drawn redistricting-do not flow from a constitutional grant of power, but instead from the provisional situation that has been created by declaring the 1963 commission to be inseverable from the unconstitutional apportionment standards.
Finally, VNP's proposal only modestly changes the judicial branch's role in the redistricting process. The 1963 Constitution has provided this Court with jurisdiction when the commission reached an impasse, **99 which it often did.[169] In such cases, the commission members could submit *274 proposed plans to this Court, and we would have to select the one that best reflected constitutional requirements.[170] Additionally, the Constitution provided us original jurisdiction over applications by electors after the commission published a plan-we could then direct the Secretary of State and the commission to "perform their duties," review the commission's proposed plan, and remand the plan to the commission "if it fails to comply with the requirements of this constitution."[171] Thus, the Constitution offered this Court a limited array of options to review redistricting plans. VNP's proposal does likewise. In some ways, in fact, the review is slightly broader. When the original commission failed to reach agreement under the current Constitution, this Court was empowered only to select between the plans proposed by the commission members. Under VNP's proposal, we can review any challenge to a plan for compliance not only with this Constitution, but also the United States Constitution and "superseding federal law."[172] Thus, the Court would no longer have the option to choose a plan-from those presented-but it would maintain the same general powers it wielded under the 1963 Constitution as ratified.[173] **100 In sum, VNP's proposal leaves the form and structure of the government essentially as it was envisioned in the 1963 Constitution. Consequently, it is not equivalent to a new constitution and is therefore a permissible amendment under Const 1963, art 12, § 2.[174]
This conclusion finds support from a host of other considerations. It is consistent with the expectations of key members of the 1961-1962 constitutional convention, as evidenced by their discussion of the signature requirement in Article 12, § 2. During that discussion, which centered on whether to add an alternative requiring only 300,000 signatures,[175] some delegates expressed the belief that a voter-initiated amendment could be used to change the apportionment system, which was a noted problem at the convention. One delegate-referring to the United States Supreme Court's then-recent decision in Baker v. Carr , which opened the door to constitutional challenges to redistricting[176] -thought that the initiative could be "a remedy to the problem of reapportionment."[177]
*275 Delegate Stevens, one of the leading proponents of keeping **101 the amendment process difficult, agreed, opining that "the initiative could be used for amending the constitution to make apportionment ... or changing the apportionment easier."[178]
Similarly, when declaring the redistricting commission not viable in 1982, this Court suggested that our apportionment system could be addressed through an amendment to the Constitution initiated by the people.[179] Our statement, quoted above, bears repeating: "The power to redistrict and reapportion the Legislature remains with the people ."[180] It was only because the amendment process-whether initiated by the Legislature or the people-was time-consuming that we invited the Legislature to fill the void.[181] As Justice LEVIN later explained, our approach in 1982 was based, in part, on the "assumption ... that responsible persons would come forth and place on the ballot, and the people would adopt, new apportionment rules in time for the 1992 and 1994 elections. Indeed, that was one of the arguments for non-severability-to highlight the need for a new constitutional provision regarding legislative apportionment."[182] "The Court's exhortation," he added, "has not been heeded."[183]
**102 The history of our constitutional amendments, too, supports treating VNP's proposal as a proper voter-initiated amendment.[184] Most directly, the voters have in the past proposed a number of amendments dealing with apportionment,[185] including one successful amendment that, in certain circumstances, expressly stripped the Legislature of the power to redistrict. In 1952, voters initiated two competing constitutional amendments addressing apportionment.[186] The successful amendment "guaranteed the decennial reapportionment of the house of representatives substantially on a population basis, and fixed senate districts permanently in the constitution ...."[187] The Legislature was responsible *276 for reapportioning the house, but, critically, if it failed to do so "in accordance with the mandate of this [constitutional] article, the board of state canvassers" was required to reapportion the districts.[188] In other words, the voters initiated an amendment that, in certain cases, eliminated the Legislature's reapportionment power and gave it to an agency in the executive branch. By comparison, VNP's proposal is more modest-the present Constitution **103 prescribes a commission for these purposes, and VNP's amendment would retain that commission. The voters have also approved, in the past, various amendments creating commissions or affecting the powers of government at various levels and branches.[189]
Other states have created independent redistricting commissions through voter-initiated amendments, including Arizona and California.[190] And the issue of whether to create such a commission has appeared on the ballot, by virtue of the initiative process, numerous times in multiple states.[191] Similarly, citizens in several states have employed initiatives to accomplish redistricting.[192]
**104 Our conclusion today is also reinforced by the reasoning in Bess v. Ulmer , which addressed a similar argument concerning a similar ballot proposal.[193] In Bess , a "Legislative Resolve" placed a proposed amendment before the voters that would remove the reapportionment power from the executive branch (where the state's constitution had placed it) and transfer it to a "neutral body."[194] Using a test similar to what the Court of Appeals employed in this case-focusing on the quantity and quality of the proposed changes and whether the changes were few, simple, and *277 of less importance-the Alaska Supreme Court determined that the proposal was an amendment:
Reassigning this power is unquestionably a significant change in the present system of Alaskan government. It does not, however, deprive the executive branch of a "foundational power," and as a result does not constitute a revision. As the quantitative effect of the proposal is minimal, the qualitative force of this narrow change would have to be greater to satisfy our hybrid test. The essential function of the executive branch-to enforce the laws of the state-remains unchanged, as does its structure. No executive power is delegated to either of the other two branches. In fact, the intent of the Framers in giving the reapportionment power to the executive was primarily to prevent the abuse or neglect of that power in the hands of the legislature, rather than to safeguard a uniquely executive function.[195 ]
**105 In our case, the framers of the 1963 Constitution did not assign the apportionment power to any elected body, and so the effect of the changes here would be even less significant than that in Bess .[196]
Thus, our holding here reflects the constitutional text, our historical experience, logic, and the wisdom of other states. For all the above reasons, then, we conclude that VNP's proposal does not create the equivalent of a new constitution by significantly altering or abolishing the form or structure of our government and is, instead, a permissible voter-initiated amendment.[197]
*278 **106 V. CONCLUSION
The question we face today has broad significance for the people of this state: what limitations have they placed, in the Constitution they ratified, on their power to put forward voter-initiated amendments? This question implicates some of the oldest and most perplexing problems in political theory, such as the nature of sovereignty, republicanism, and democracy. But it is not a judge's role to philosophize a theory of government. Rather, we are stewards of the people and must faithfully abide by the decisions they make through the laws they adopt. We accomplish this by adhering to the plain meaning of the text of those laws. Here, that approach leads us to conclude that a voter-initiated amendment under **107 Const 1963, art 12, § 2 is permissible if it does not significantly alter or abolish the form or structure of our government, making it tantamount to creating a new constitution. VNP's proposal surpasses these hurdles and is a permissible voter-initiated amendment under Article 12, § 2. Accordingly, the judgment of the Court of Appeals is affirmed. Pursuant to MCR 7.315(C)(3), the Clerk of the Court is directed to issue the judgment forthwith.
David F. Viviano
Bridget M. McCormack
Richard H. Bernstein
Elizabeth T. Clement

In re Apportionment of State Legislature-1982 , 413 Mich. 96, 321 N.W.2d 565 (1982).

MCL 168.477.

While multiple plaintiffs appear in the action, for ease of reading we will refer to CPMC alone.

Again, we will refer only to VNP and not the other parties.

Citizens Protecting Michigan's Constitution v Secretary of State , 324 Mich. App. 561 (2018), order entered June 7, 2018 (Docket No. 343517).

Citizens Protecting Michigan's Constitution v. Secretary of State , 324 Mich. App. 561, ----, --- N.W.2d ----, 2018 WL 2746592 (2018) (Docket No. 343517) (CPMC ), slip op. at 15.

Id . at ----, slip op. at 16, --- N.W.2d ----.

Id . at ---- - ----, slip op. at 16-17, --- N.W.2d ----, citing Citizens Protecting Michigan's Constitution v. Secretary of State , 280 Mich. App. 273, 305, 761 N.W.2d 210 (2008), aff'd in result only 482 Mich. 960, 755 N.W.2d 157 (2008). This 2008 Court of Appeals case and its affirming order will be referred to as Citizens throughout this opinion.

CPMC , --- Mich. App. at ---- & n. 21, ---- - ----, slip op. at 8 & n 21, 18-19, --- N.W.2d ----.

Id . at ----, slip op. at 18, --- N.W.2d ----.

Id . at ----, slip op. at 19, --- N.W.2d ----.

Id . at ----, slip op. at 20, --- N.W.2d ----.

Citizens Protecting Michigan's Constitution v. Secretary of State , 324 Mich. 561, 912 N.W.2d 181 (2018).

Citizens Protecting Michigan's Constitution v. Secretary of State , 324 Mich. 561, 913 N.W.2d 657 (2018) (Docket No. 157925).

See People ex rel. King v. Wayne Circuit Judge , 41 Mich. 727, 49 N.W. 925 (1879).

Bonner v. City of Brighton , 495 Mich. 209, 221, 848 N.W.2d 380 (2014).

Const 1963, art 1, § 1.

Blank v. Dep't of Corrections , 462 Mich. 103, 150, 611 N.W.2d 530 (2000) ( Markman , J., concurring). Indeed, Michigan is one of the leading states when it comes to direct democracy reforms. In addition to retaining the right to amend the Constitution by direct initiative, the people of Michigan have also reserved the power to propose and enact statutes by initiative, Const 1963, art 2, § 9 ; to reject statutes by referendum, id . ; and to recall elected officials, Const 1963, art 2, § 8. Michigan is one of only eight states whose people have retained each of these forms of direct democracy. See National Conference of State Legislatures, Initiative and Referendum States< http://www.ncsl.org/research/elections-and-campaigns/chart-of-the-initiative-states.aspx> (accessed July 30, 2018) [http://perma.cc/H7PP-NHJQ]; National Conference of State Legislatures, Recall of State Officials< http://www.ncsl.org/research/elections-and-campaigns/recall-of-state-officials.aspx (accessed July 30, 2018) [http://perma.cc/3UVQ-CY7Y]. After a 1913 amendment removing legislative oversight of the initiative process, the initiative "has proven extremely popular," according to a study prepared for the Constitutional Convention Preparatory Commission, adding that "[i]t is among the most used of Michigan's devices for direct government." McHargue, (1961), p. 19.

See Mich. United Conservation Clubs v. Secretary of State , 464 Mich. 359, 368-369, 630 N.W.2d 297 (2001) ( Young , J., concurring).

Cf. id . at 389, 630 N.W.2d 297 ("[T]he people's ability to decide [whether to retain a statute] by the referendum process is not infinite; rather, it is circumscribed by the limitations placed in the Michigan Constitution.").

Id . at 393, 630 N.W.2d 297 ( Markman , J., concurring).

Scott v. Secretary of State , 202 Mich. 629, 643, 168 N.W. 709 (1918) ; see also Protect Our Jobs v. Bd. of State Canvassers , 492 Mich. 763, 772, 822 N.W.2d 534 (2012) ("This Court has consistently protected the right of the people to amend their Constitution in this way, while enforcing constitutional and statutory safeguards that the people placed on the exercise of that right.").

Such a clear limitation could, for example, look like the one we addressed in Mich. United Conservation Clubs , 464 Mich. 359, 630 N.W.2d 297. In that case, we examined Const 1963, art 2, § 9, which states that the constitutional referendum power "does not extend to acts making appropriations for state institutions ...." We had little trouble deciding that an appropriation to the state police was, under the constitutional exemption, not subject to referendum. No analogous provision appears in Article 12, § 2.

People v. Tanner , 496 Mich. 199, 223, 853 N.W.2d 653 (2014) (citation omitted).

Federated Publications, Inc. v. Bd. of Trustees of Mich. State Univ. , 460 Mich. 75, 85, 594 N.W.2d 491 (1999), quoting 1 Cooley, Constitutional Limitations (6th ed), p. 81 (quotation marks and citations omitted).

Tanner , 496 Mich. at 226, 853 N.W.2d 653, quoting People v. Nash , 418 Mich. 196, 209, 341 N.W.2d 439 (1983). Indeed, this Court has stated that convention records may be "highly valuable." Tanner , 496 Mich. at 226 n 20, 853 N.W.2d 653. Of course, we recognize that this evidence cannot be used to contradict a limitation that appears in the constitutional text.

Const 1963, art 12, § 1.

Const 1963, art 12, § 2.

Id .

Id .

Const 1963, art 12, § 3.

Id .

Woodland v. Mich. Citizens Lobby , 423 Mich. 188, 218, 378 N.W.2d 337 (1985) (" 'The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as election was over their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature.' "), quoting Hamilton v.Secretary of State , 227 Mich. 111, 130, 198 N.W. 843 (1924) ; see also 1 Proceedings and Debates of the Constitutional Convention of the State of Michigan 1907-1908 , p. 590 ("The trouble is not with the representative government, it is with this eternal mis-representative government .... We want the initiative on constitutional amendments why? Because we want the legislature to sometimes pay some attention to the voice of the people, and ... this right in the people is necessary to a proper regulation of the legislature.") (statement of Delegate Frank Pratt).

Scott , 202 Mich. at 643, 168 N.W. 709.

Ferency v. Secretary of State , 409 Mich. 569, 590-591, 297 N.W.2d 544 (1980).

Consumers Power Co. v. Attorney General , 426 Mich. 1, 7-8, 392 N.W.2d 513 (1986).

Citizens , 280 Mich. App. 273, 761 N.W.2d 210.

By the Court of Appeals' count, the RMGN initiative petition sought to alter four separate articles of the Michigan Constitution and proposed at least 29 separate changes. Id . at 279-281, 761 N.W.2d 210 (listing the proposed changes).

Id . at 281-282, 761 N.W.2d 210.

Id . at 305, 761 N.W.2d 210.

The Court of Appeals did not do an extended exegesis of the constitutional text and concluded that dictionary definitions from the time of ratification, "[w]hile somewhat helpful to the analysis, ... do not completely reveal the differentiation that was intended by the framers of the constitution from their use of the words 'amendment' and 'revision.' " Id . at 295, 761 N.W.2d 210.

See Kelly v. Laing , 259 Mich. 212, 242 N.W. 891 (1932).

See Sch. Dist. of City of Pontiac v. City of Pontiac , 262 Mich. 338, 247 N.W. 474 (1933).

See McFadden v. Jordan , 32 Cal. 2d 330, 196 P.2d 787 (1948) ; Livermore v. Waite , 102 Cal. 113, 118-119, 36 P. 424 (1894).

Citizens , 280 Mich. App. at 304-305, 761 N.W.2d 210.

Laing , 259 Mich. at 214, 242 N.W. 891.

Id . at 216, 242 N.W. 891.

Id . at 217, 242 N.W. 891. Laing is noteworthy for another reason: in further dicta, the Court indicated that it considered an increase in the number of city commissioners and a change in the way their districts were drawn as properly the subject of an amendment to the city charter. See id . at 222, 242 N.W. 891 ("Speaking generally and without stopping to examine the precise effect of those at bar, it is evident that a proposal to increase the number of commissioners from five to nine, with the machinery necessary therefor [i.e., abolishing the existing districts so the new commission members could be elected by wards], would merely be a change of detail and, therefore, an amendment.").

Pontiac Sch. Dist. , 262 Mich. at 345, 247 N.W. 474.

Id .

Id.

Citizens , 482 Mich. at 964, 755 N.W.2d 157 ( Corrigan , J., concurring, joined by Taylor , C.J., and Young , J.) ("On the basis of my review, which was limited by time constraints, I do not see a clear error in the Court of Appeals articulation ....").

Id . at 961, 755 N.W.2d 157 ( Cavanagh, Weaver , and Markman , JJ., concurring).

Id . at 960, 755 N.W.2d 157.

One member of this grouping wrote separately to make this point explicitly. See id . at 962, 755 N.W.2d 157 ( Weaver , J., concurring) ("The Court of Appeals opinion is an example of judicial activism-of the unrestrained, mistaken use of the power of interpretation. ... It wrongly creates a 'judicial veto' over future voter-initiated proposed amendments by petition even if such a proposed amendment were a one (1)-issue, single-purpose amendment whose 'not more than 100 words' purpose statement for printing on the ballot would easily be sufficient, understandable, impartial, and true."). The Court of Appeals, for its part, conceded that it was unable "to define with nicety the line of demarcation between an 'amendment' and a 'general revision.' " See Citizens , 280 Mich. App. at 305, 761 N.W.2d 210 (cleaned up).

Citizens , 482 Mich. at 964, 966, 755 N.W.2d 157 ( Kelly , J., dissenting).

Protect Our Jobs v. Bd. of State Canvassers , unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828), 2012 WL 3660260.

Id . at 1-2.

Id . at 2.

Id . at 2-3.

Protect Our Jobs v. Bd. of State Canvassers , 492 Mich. 862, 819 N.W.2d 571 (2012).

See Protect Our Jobs , 492 Mich. 763, 822 N.W.2d 534.

The Chief Justice's dissent does not engage in a textual analysis of our Constitution-it does not, for example, directly examine the meanings of the relevant terms, but rather looks to what a few cases have said, generally, about those terms. However, "a judge must remember 'above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put upon it.' " Markman, On Interpretation and Non-Interpretation , 3 Benchmark 219, 220 (1987), quoting Douglas, Stare Decisis , 49 Colum L Rev 735, 736 (1949); see also Goldstone v. Bloomfield Twp. Pub. Library , 479 Mich. 554, 561 n. 4, 737 N.W.2d 476 (2007) (recognizing that "the actual language of the proposed constitution constitutes the best evidence of the 'common understanding' " of the ratifiers).
Even so, we believe the Chief Justice's dissent engages in revisionist legal history when it asserts that our precedents in this area have established "longstanding standards" on this point that are "consistent and compatible with each other, as well as with what is required by our Constitution ...." Post at 284. Indeed, the opinion labors to give its rule some provenance by repeatedly citing the age of the cases he relies upon, rather than focusing on their content. See post at ---- ("[F]or at least the past 85 years in Michigan, governing law concerning direct constitutional change has been characterized by the following ...."); post at 284 ("[O]ur Court would recognize, as [it has] for the past 85 years ...."); post at 286 (referring to "the standard set forth by our precedents over 85 years ago"); post at 287 (referring to "the standard set forth by our precedents over the course of 85 years"). And, for good measure, the dissent accuses the majority of altering these longstanding standards. But if the standard set forth in Laing and Pontiac Sch. Dist. and the Court of Appeals decisions in Citizens and Protect Our Jobs was so clear and longstanding on this point, one wonders why this Court refused to adopt it in 2008 in Citizens , instead issuing a highly unusual order leaving this area of law in a state of limbo. In any event, as already mentioned, Laing and Pontiac Sch. Dist. did not review the text of the Constitution or purport to establish any constitutional standard at all on this point. In light of this, it would be euphemistic to say that these cases have created a judicial gloss supporting the dissent's reasoning-instead, they appear to us more like a spray-on tan.
If it is bad to depart from the plain language of our Constitution on the basis of a judicial gloss that is binding precedent, how much worse it must be to do so on the basis of the spotty and inapposite authority the dissent relies upon in this case. Cf. Markman, Resisting the Ratchet , 31 Harv J L & Pub Pol'y 983, 985 (2008) ("[T]o read the law consistently with its language, rather than with its judicial gloss, is not to be 'harsh' or 'crabbed' or 'Dickensian,' but is to give the people at least a fighting chance to comprehend the rules by which they are governed."). Repeatedly calling these cases the "best and most authoritative and most consistent " precedents of this Court, post at 283 n. 2, the "most compelling precedents of this state," post at 282 n. 2, and the "best and the most enduring relevant precedents of this state," post at 288 n. 9, does not make them so, even if with the use of italics.

Because the predecessor to Article 12, § 2 first appeared in the 1908 Constitution, Const 1908, art 17, § 2, and was retained in our current Constitution, which was ratified in 1963, we will look to dictionaries from those periods to help interpret the term.

The Century Dictionary: An Encyclopedic Lexicon of the English Language (1911), p. 173; see also The American Heritage Dictionary of the English Language (1969) ("Amendment" is "[a] correction" or "a revision or change."); Webster's Third New Int'l Dictionary (1966): ("Amendment" is the "act of amending," the "correction of a fault or faults," or "the process of amending[.]"); The Random House Dictionary of the English Language (1966) ("Amendment" is "the act or state of amending or the state of being amended," "an alteration of or addition to a motion, bill, constitution, etc.," or "a change made by correction, addition, or deletion[.]"). If "amendment" were considered a term of art, the dictionary definition would not be materially different. See Black's Law Dictionary (2d ed, 1910) ("Amendment" is "[t]he correction of an error" in any proceeding at law, or "[a]ny writing made or proposed as an improvement of some principal writing."); see also Ballentine's Law Dictionary (3d ed, 1969) ("Amendment" means "[a] correction or revision of a writing to correct errors or better to state its intended purpose.").

Const 1908, art 17, § 2 ("All petitions for amendments filed with the secretary of state shall be certified by that officer to the legislature at the opening of its next regular session; and when such petitions for any one proposed amendment shall be signed by not less than the required number of petitioners, he shall also submit the proposed amendment to the electors at the first regular election thereafter, unless the legislature in joint convention shall disapprove of the proposed amendment by a majority vote of the members elected. The legislature may, by a like vote, submit an alternative or a substitute proposal on the same subject.") (emphasis added).

Address to the People, Const 1908, art 17, §§ 2 and 3 (1908), p. 64 (emphasis added).

Id . (emphasis added).

See Direct Government , p. 19 (discussing the 1913 amendment); see also Fairlie, The Referendum and Initiative in Michigan , 43 Annals of Am Acad of Pol and Soc Sci 146, 153 (Sept 1912) (observing that for a few years after the 1908 Constitution was in place, no amendments were proposed, and speculating that this was "due in part to the restrictions in the method provided").

See Const 1908, art 12, § 2.

2 Official Record, Constitutional Convention 1961, p. 2459 (capitalization altered).

Id . at 2462-2465.

Id . at 2462 (statement of Delegate Stevens). He later said his "objection to this provision [i.e., the 300,000 vote provision] and the reason for this amendment is simply to make it more difficult to amend the constitution than to pass an ordinary statute." Id . at 3199. This was a real concern because, as he noted, the Constitution at that time only required signatures equal to 8 percent of the votes for Governor from the most recent general gubernatorial election in order to propose legislation by initiative petition. Id . at 2462.

A similar argument was made in 1913, when the Legislature was considering an amendment that would relax the restrictions on voter-initiated amendments. See 1913 House Journal 698 ("It may be true that [requiring signatures from 20 percent of the electors] is too high a percentage. However, the Constitution is the bulwark and foundation of our laws, and constitutional amendments have broader significance than statutory amendments," and accordingly some figure higher than 8 percent was appropriate.) (statement of Representative Charles McBride).

There are, of course, other provisions in the text, such as the 100-word summary requirement, that are not germane to resolving the present case. See Const 1963, art 12, § 2 ("The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption.").

Dodd, The Revision and Amendment of State Constitutions (Baltimore: Johns Hopkins Press, 1910), p. 261. The treatise was written at time when popularly initiated constitutional amendments, such as the petition initiative here, were just coming into use and legislatively initiated amendments were more common; but in either case the comparison is between an amendment and a revision. See generally Goebel, A Government by the People: Direct Democracy in America, 1890-1940 (Chapel Hill: University of North Carolina Press, 2002), pp. 27-29 (noting that legislatures originated many constitutional amendment proposals in the nineteenth century, and that the mechanism for popularly initiated amendments began only in the last decade of that century); Jameson, A Treatise on Constitutional Conventions; Their History, Powers, and Modes of Proceeding (1887), § 544, pp. 568-569 (writing near the end of the nineteenth century and noting that, with few exceptions, constitutional change came only after the legislature either called a convention or proposed an amendment).

Const 1963, art 12, § 3.

As members of the 1961-1962 constitutional convention recognized, a convention had unrestrained authority to offer a new constitution or narrower amendments. One delegate noted that a convention, "if it so saw fit, could, for all intents and purposes disregard the idea of a general revision and merely confine itself to a single amendment or a few amendments and leave the basic document unchanged ...." 2 Official Record, Constitutional Convention 1961, p. 3007 (statement of Delegate Alvin Bentley). This was because, as another delegate observed, conventions were "sovereign, autonomous bodies." Id . (statement of Delegate Donald Habermehl). A convention's broad discretion has long been noted. See Direct Government , p. 9 ("[T]he convention is also used for the purpose of initiating amendments to an existing document."); Revision and Amendment , p. 258 ("Yet of course a constitutional convention when assembled may not make a general revision but may simply propose specific amendments."); id . at 258 n 243 ("It lies within the discretion of a convention ordinarily as to whether its action shall be substituted (1) in the form of separate amendments, or (2) as a complete new constitution, or (3) as a new constitution but with separate provisions which may be voted upon independently. As between the first and second plans it may be said that the second is to be preferred if the changes are so great as to make submission as separate amendments confusing ....").

Const 1963, art 12, § 2.

Cf. Livermore , 102 Cal. at 118-119, 36 P. 424 (observing that "the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument").

Cf. Attorney General ex rel. Vernor v. Common Council of Detroit , 168 Mich. 249, 252, 133 N.W. 1090 (1912) (noting, with regard to changes to a city charter, that "a general revision of an old charter may be treated as equivalent to the framing of a new charter"). As one treatise explained, around the time we adopted our Constitution, it might be "legally proper, ... in the absence of specific constitutional restrictions to propose to the people by the legislative process [for initiating amendments] any constitutional alteration short of a complete revision or even a complete revision." Revision and Amendment , p. 261. The treatise noted, however, that "if a constitution specifically provides two methods of alteration, the language employed with reference to the proposal of amendments by the legislative method may, when read with that concerning the convention method, often be construed as an implied prohibition of complete constitutional revision by the legislative method." Id . The same basic point can be made about our initiative method of amendment. But, as the explanation above demonstrates, the text and structure of our Constitution establishes the prohibition on completely rewriting the Constitution by means of an initiative amendment.

Const 1963, art 12, § 3.

The Random House Dictionary of the English Language (1966). Other dictionaries accord with this definition. See, e.g., Webster's Third New Int'l Dictionary (1967) ("General" is "involving or belonging to the whole of a body ... rather than to a limited part, group, or section," "concerned or dealing with universal rather than particular aspects," "marked by broad overall character without being limited, modified, or checked by narrow precise considerations[.]").

The Random House Dictionary of the English Language (1966). The same basic definition appears in other dictionaries. See The American Heritage Dictionary of the English Language (1969) ("Revision" is "[t]he act or procedure of revising."); Webster's Third New Int'l Dictionary (1967) ("Revision" is "an act of revising : re-examination or careful reading over for correction or improvement[.]"); The Century Dictionary: An Encyclopedic Lexicon of the English Language (1911) (defining "revision" as "[t]he act of revising; reëxamination and correction"). As with the term "amendment," discussed above, the relevant dictionary definition does not change if we considered "revision" to be a legal term of art. See Ballentine's Law Dictionary (3d ed, 1969) ("Revision" means "[l]ooking over a thing ... and reviewing it carefully for the purpose of making changes, additions, and corrections, if such be deemed advisable."); Black's Law Dictionary (2d ed, 1910) (not defining "revision" but defining "revise" as "[t]o review, re-examine for correction; to go over a thing for the purpose of amending, correcting, rearranging, or otherwise improving it").

See Laing , 259 Mich. at 217, 242 N.W. 891 ("Revision implies a re-examination of the whole law ....").

1 Proceedings and Debates of the Constitutional Convention of the State of Michigan 1907-1908 , p. 611 (statement of delegate Benjamin Heckert).

See, e.g., CPMC , --- Mich. App. at ----, slip op. at 15, --- N.W.2d ---- ("Our courts long have recognized that an amendment is not the same as a general revision and have attempted to define the differences between them where the constitutional provisions themselves do not define the terms."); Citizens , 280 Mich. App. at 277, 761 N.W.2d 210 ("As we will explain, the Michigan Constitution clearly establishes separate methods for enacting an 'amendment' to, as compared to a 'general revision' of, the constitution.").

This distinction is further borne out by the much different requirements for calling a convention under Article 12, § 3 and for initiating an amendment proposal under Article 12, § 2. The most significant hurdle to placing a proposed amendment on the ballot by initiative petition under Article 12, § 2 is the requirement of obtaining signatures from "registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor" at the most recent general gubernatorial election. Const 1963, art 12, § 2. If the petitioner summarizes the proposal in a statement of not more than 100 words and complies with various ministerial requirements, the initiative will appear on the ballot. Id . By contrast, to call a convention, voters must either persuade the Legislature to pass a bill placing on the ballot the question of whether to call a convention, or the voters must wait until the question is placed on the ballot automatically every 16 years. Const 1963, art 12, § 3. If a majority of the voters at that election agree, a convention will be held. Id . This, in turn, requires 148 individual elections for the delegates (determined by the number of senators and representatives in the Legislature), the drafting and approval of language at the convention, and then a subsequent vote of the electors on whatever the convention produces. Id . Clearly, the more cumbersome and arduous process for calling a convention reflects the fact that a convention can produce more sweeping changes than can a lone amendment proposed by initiative. See Revision and Amendment , p. 261.

Cf. Opinion of the Justices , 264 A.2d 342, 345 (Del., 1970) ("A threshold truism is that the mere number of changes cannot make the difference. Legislative amendments are not limited in number by [the constitution]; and a 'revision' ... does not come into being by reason of the mere number of changes or the mere fact that the changes concern the entire Constitution."). The test we adopt today is based on the constitutional text. By contrast, the qualitative/quantitative test used by the Court of Appeals, and endorsed in an altered form by the Chief Justice's dissent, comes from a line of California caselaw that began in the nineteenth century. See Citizens , 280 Mich. App. at 299-305, 761 N.W.2d 210 (tracing California law and adopting it as consistent with our law).

See New York Times Co. v. Sullivan , 376 U.S. 254, 275, 84 S.Ct. 710, 11 L. Ed. 2d 686 (1964) (noting the view of James Madison "that the Constitution created a form of government under which 'The people, not the government, possess the absolute sovereignty.' "), quoting 4 Elliot's Debates on the Federal Constitution (1876), pp. 569-570; Wood, Creation of the American Republic 1776-1787 (Chapel Hill: University of North Carolina Press, 1969), p. 600 ("A constitution for Americans, said Thomas Paine, was 'not a thing in name only; but in fact. ... It is the body of elements to which you can refer, and quote article by article; and which contains ... every thing that relates to the complete organization of a civil government, and the principles on which it shall act, and by which it shall be bound.' "), quoting Paine, Rights of Man , in 1 Foner, ed, Complete Writings of Thomas Paine (New York: The Citadel Press, 1945), p. 278; see also Friedman, A History of American Law (New York: Simon & Schuster, 2005), p. 74 ("A constitution is different from ordinary statute law. It has two crucial functions. First, it sets up and sets out the structure of government-its permanent shape, its organs or parts, and their rights, duties, boundaries, and limits. Second, it can list the essential rights of the citizen; this list is supposed to limit what government is allowed to do[.]").

Cf. Bess v Ulmer , 985 P.2d 979, 987 (Alaska 1999) ("The core determination is always the same: whether the changes are so significant as to create a need to consider the constitution as an organic whole."); Amador Valley Joint Union Valley High Sch. Dist. v. State Bd. of Ed. , 22 Cal. 3d at 223, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978) ("However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also.").

See Pontiac Sch. Dist. , 262 Mich. at 345, 247 N.W. 474.

Nat'l Labor Relations Bd. v. Noel Canning , 573 U.S. ----, 134 S.Ct. 2550, 2597, 189 L. Ed. 2d 538 (2014) (Scalia, J., concurring in judgment); see also id . at ----, 134 S.Ct. at 2597-2598 (" 'Convenience and efficiency,' we have repeatedly recognized, 'are not the primary objectives' of our constitutional framework.") (citation omitted).

See, e.g., Bess , 985 P.2d at 988 (holding that a proposed amendment of a constitution that would transfer reapportionment authority from the executive branch to an independent board was a permissible amendment because "the qualitative force of this narrow change" was not great enough, even though "[r]eassigning this power [was] unquestionably a significant change in the present system").

People v. Cook , 147 Mich. 127, 132, 110 N.W. 514 (1907).

Plaintiffs do not contend that the Constitution requires amendments to have only a single purpose and that VNP's proposal therefore fails because it has multiple purposes. In fact, in the Court of Appeals, they disclaimed this argument. Therefore, we decline to decide whether the Constitution requires amendments to have only a single purpose and instead leave that question for another day.

See Const 1835, art 4, § 3 ; Const 1850, art 4, § 4 ; Const 1908, art 5, § 4 (as ratified).

For example, around 1910, when the federal census was completed showing that the urban population was growing, "[m]embers of the legislature, the majority of whom represented rural areas and small towns, balked at carrying out the requirement that the legislature be reapportioned in 1913 and every tenth year thereafter," and consequently, no reapportionment occurred in 1923 or 1933 (although a belated senate reapportionment was adopted in 1925). Dunbar & May, Michigan: A History of the Wolverine State (Grand Rapids: William B Eerdmans Publishing Co, 1995), pp. 548-549. Ten years later, when it again came time to reapportion, the Senate was not reapportioned, although the House passed legislation to reapportion. Id . at 549.

Id .

See id .; Const 1908, art 5, §§ 2 through 4 (as amended).

Concern was expressed at the convention that redistricting by the Legislature may not be the best approach. See 2 Official Record, Constitutional Convention 1961, p. 2014 (noting that "[r]eliance on legislatures to reapportion themselves generally has been futile. Most authorities agree that self reapportionment poses so many problems that it is seldom voluntarily undertaken by legislatures") (statement by Delegate John Hannah); see also id . at 2015 ("[The committee on legislative organization] became convinced that it is totally unrealistic to expect a legislature to redistrict and reapportion seats in its own body. Redistricting inevitably involves the possible denial of seats to members of the existing legislature ....").

CPMC , --- Mich. App. at ----, slip op. at 5, --- N.W.2d ----, citing Const 1963, art 4.

Const 1963, art 4, § 2.

Const 1963, art 4, § 3.

In re Apportionment of State Legislature-1982 , 413 Mich. at 107, 321 N.W.2d 565.

Const 1963, art 4, § 6.

Id .

Id .

Id .

Id .

Id .

Id .

Id . In 1963, the Legislature passed a statute to provide for the redistricting commission. 1963 (2d Ex Sess) PA 46, MCL 4.11 et seq . The statute has never been repealed and remains on the books.

Baker v. Carr , 369 U.S. 186, 237, 82 S.Ct. 691, 7 L. Ed. 2d 663 (1962).

Reynolds v. Sims , 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L. Ed. 2d 506 (1964).

See id . at 567, 84 S.Ct. 1362 ("[T]he weight of a citizen's vote cannot be made to depend on where he lives.").

See Marshall v. Hare , 378 U.S. 561, 84 S.Ct. 1912, 12 L. Ed. 2d 1036 (1964), rev'g 227 F.Supp. 989 (E.D. Mich., 1964).

In re Apportionment of State Legislature-1964 , 373 Mich. 247, 248-249, 128 N.W.2d 721 (1964).

In re Apportionment of State Legislature-1964 , 373 Mich. 250, 254, 128 N.W.2d 722 (1964).

Id . at 259, 128 N.W.2d 722 ( Souris , J., concurring); see also id . ("It is incomprehensible to me that the people of this State ... would have intended to grant a commission composed of 8 members selected by the 2 major political parties in the State from 4 specifically designated areas of the State the power of apportionment and districting of the State's legislature without the very specific and rigidly limiting directions unconstitutionally and ineffectually sought to be imposed upon the commission by the [apportionment formulas].").

See In re Apportionment of State Legislature-1972 , 387 Mich. 442, 197 N.W.2d 249 (1972).

Id . at 458, 197 N.W.2d 249.

Id . at 493, 197 N.W.2d 249 (T.G. Kavanagh , J., dissenting).

In re Apportionment of State Legislature-1982 , 413 Mich. at 116, 321 N.W.2d 565.

Id . at 136-137, 321 N.W.2d 565.

Id . at 137-138, 321 N.W.2d 565.

Id . at 138, 321 N.W.2d 565 ; see also id . ("The matter should be returned to the political process in a manner which highlights rather than hides the choices the people should make.").

Id . at 139-140, 321 N.W.2d 565.

Id . at 140 n 25, 321 N.W.2d 565.

Id . at 140-142, 321 N.W.2d 565.

Id . at 142-143, 321 N.W.2d 565.

Id . at 140, 321 N.W.2d 565.

See 1996 PA 463 (state legislative districts); 1999 PA 221 (federal congressional districts).

VNP proposal, art 4, §§ 2 through 3.

VNP proposal, art 4, § 13. Although the proposed language is presented capitalized, this opinion presents it in standard type throughout for ease of reading.

VNP proposal, art 4, § 6.

VNP proposal, art 4, § 6 (2)

Id .

Id .

VNP proposal, art 4, § 6(2)(E).

VNP proposal, art 4, §§ 6(8) through (11).

VNP proposal, art 4, § 6(14).

VNP proposal, art 4, § 6(4) ; see Const 1963, art 4, § 6 ("all necessary technical services").

VNP proposal, art 4, § 6(5) ; Const 1963, art 4, § 6.

VNP proposal, art 4, § 6(19). By statute, we presently have "original and exclusive state jurisdiction to hear and decide all cases or controversies in ... involving a redistricting plan" drawn under the current scheme. MCL 4.262.

VNP proposal, art 6, § 6(22).

VNP proposal, art 5, § 2.

VNP proposal, art 4, § 1; VNP proposal, art 5, § 1; VNP proposal, art 6, § 1.

The baseline for measuring these changes includes more than just the current procedure, but also, and perhaps even more importantly, the provisions in the 1963 Constitution that are no longer effective. It is, after all, the Constitution that would be amended by VNP's proposal, not the current statutory scheme that has filled the gap created by our decision holding that the present constitutional provisions are unconstitutional. See In re Apportionment of State Legislature-1982 , 413 Mich. at 115-116, 321 N.W.2d 565. Despite our ruling, we have no power to make the law disappear. Cf. Steffel v. Thompson , 415 U.S. 452, 469, 94 S.Ct. 1209, 39 L. Ed. 2d 505 (1974) (" 'Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear.' ") (citation omitted); Winsness v. Yocom , 433 F.3d 727, 728 (C.A. 10, 2006) ("There is no procedure in American law for courts or other agencies of government-other than the legislature itself-to purge from the statute books, laws that conflict with the Constitution as interpreted by the courts."); Pidgeon v. Turner , 538 S.W.3d 73, 88 n 21 (Tex., 2017) ("When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it."); see generally Mitchell, The Writ-of-Erasure Fallacy , 104 Va L Rev (forthcoming 2018), pp. 4-5 ("[T]he statute continues to exist, even after a court opines that it violates the Constitution, and it remains a law until it is repealed ...."). Indeed, that is why VNP's proposal strikes out various provisions long held unconstitutional. This is not to say that those provisions could now constitutionally be enforced; rather, they simply remain relevant in determining the degree of change wrought by VNP's proposal. In this regard, it is also noteworthy that the statutory framework created in 1963 to effectuate the redistricting commission has never been repealed. See MCL 4.11 to 4.20. In other words, current statutes appear to require that the commission convene and submit redistricting plans.
The Chief Justice's dissent appears to suggest that judges have the power not just to declare a legal provision to be unconstitutional (i.e., to say what the law is), but rather to actually amend the Constitution by deleting from it any text the judge declares to be unconstitutional. His dissent, then, seems to suggest that a court can physically remove written text of statutes and constitutions. But that is simply not how a judgment of even the highest court in the land works. Cf. Mitchell, Textualism and the Fourteenth Amendment , 69 Stan L Rev 1237, 1298 (2017) ("Judicial review means only that the Court may decline to enforce a federal statute in a particular case-if (and only if) the Court concludes that enforcing the statute would conflict with its paramount duty to obey the Constitution. But federal statutes that the Supreme Court has declared 'unconstitutional' remain laws until Congress repeals them, and the Court must enforce those laws when it can do so consistent with the Constitution.") (citations omitted). Tellingly, the Chief Justice's dissent cites several abrogated federal constitutional provisions, but these are easily distinguished given that the people have chosen to affirmatively abrogate them by ratifying superseding amendments. That is not the case here. Our decision declaring that the commission could not be severed from unconstitutional standards was not a superseding constitutional amendment, but rather a judicial remedy to cure a conflict between our state Constitution and the United States Constitution.

In re Apportionment of State Legislature-1982 , 413 Mich. at 107, 321 N.W.2d 565.

MCL 4.261 ; MCL 3.63.

MCL 4.261(c) ; MCL 3.63(c)(i ).

MCL 4.261(e) ; see also MCL 3.63(c)(ii ) ("Congressional district lines shall break as few county boundaries as is reasonably possible.").

MCL 4.261(i) ; MCL 3.63(c)(vi ).

VNP proposal, art 4, § 13.

Compare Const 1963, art 4, § 6, with VNP proposal, art 4, § 6(4).

VNP proposal, art 4, § 6(2) (requiring the Secretary of State to make applications available and accept completed applications, require oaths to be taken, remove incomplete or inadequate applications, and randomly select applicants).

See, e.g., MCL 324.80320(3) ("Receipt by the secretary of state of a properly tendered application for a certificate of title on which a security interest in a watercraft is to be indicated is a condition of perfection of a security interest in the watercraft ...."); MCL 257.248(1) (requiring the Secretary of State to "conduct [an] investigation within 15 days after receiving the application" for a dealer license).

Post at 290 n. 12.

VNP proposal, art 4, § 1; VNP proposal, art 5, § 1; VNP proposal, art 6, § 1.

Post at ----.

Const 1963, art 12, § 2.

See Protect Our Jobs , 492 Mich. at 773-774, 822 N.W.2d 534 (holding that one of the proposed amendments altered or abrogated an existing constitutional provision, triggering the republication requirement).

VNP proposal, art 4, § 6(2)(E).

See, e.g., MCL 4.801 (current plan for Senate districts); MCL 4.802 (current plan for House districts).

The Chief Justice's dissent also invites us to apply the repudiated concept of legislative acquiescence to the people's failure to amend the Constitution after our decision in 1982 rendering the redistricting commission ineffective. The theory of legislative acquiescence is that the Legislature, by failing to correct a judicial decision, has acquiesced in that decision. See generally McCahan v. Brennan , 492 Mich. 730, 749-750, 822 N.W.2d 747 (2012). The Chief Justice's dissent suggests this basic theory should be imported here, based on "the entirety of the 'indirect input' in representative self-government in which the people have been engaged during the ensuing 55 years ...." Post at 291 n. 14. That is simply another way of saying that our analysis should credit the people's inaction -that they have somehow acquiesced in our 1982 decision. But we have rightly rejected theories of interpretation relying on acquiescence by nonaction. See McCahan , 492 Mich. at 749-750, 822 N.W.2d 747 ("First and foremost, legislative acquiescence has been repeatedly repudiated by this Court because it is ... an exceptionally poor indicator of legislative intent. When used in a case like this, the theory requires a court to intuit legislative intent not by anything that the Legislature actually enacts, but by the absence of action. Yet 'a legislature legislates by legislating, not by doing nothing, not by keeping silent.' Thus, the doctrine of legislative acquiescence 'is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its words , not from its silence.' ") (citations omitted); see also Markman, On Interpretation , at 226 n 60 ("[N]o sensible theory of statutory interpretation would require Congress to devote a substantial portion of its time to extinguishing judicial forest fires."). Given that it is much more difficult for the people to directly act on this topic-i.e., amend the Constitution-their failure to act sheds even less light on the matter.

See In re Apportionment of State Legislature-1982 , 413 Mich. at 116, 321 N.W.2d 565.

Cf. Laing , 259 Mich. at 217, 242 N.W. 891 ("Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose."); Opinion of the Justices , 264 A.2d at 346 ("A constitutional 'amendment' was defined ... as 'such an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purpose for which it was framed.' ") (emphasis added), quoting Livermore , 102 Cal. at 118-119, 36 P. 424 ; see also Bess , 985 P.2d at 985 (quoting the same language from Livermore ).

Const 1963, art 4, § 6.

Id .

Id . (emphasis added).

VNP proposal, art 4, § 6(19).

Under the present state of affairs, the Legislature has reconfirmed our "original state jurisdiction provided under section 6 of article IV of the state constitution of 1963...." MCL 4.262(3). While the statute provides a few other powers that we would lack under VNP's proposal, it must be repeated that the present system of redistricting is merely a stopgap designed to address the fact that the relevant constitutional provisions are not currently in effect. As a result, the system does not flow explicitly from the Constitution.

Indeed, for this reason, this proposal should be construed as an "amendment" even under the standard set forth in the Chief Justice's dissent. The dissent argues that the essential inquiry is whether the VNP proposal "fundamentally change[s] the operation of our government," post at 298, but as we have shown, no fundamental change is being wrought relative to what the voters themselves approved in 1963. The dissent gets around this by arguing that popular acquiescence in the provisional arrangement this Court put in place in 1982 amounts to a de facto amendment of the Constitution, but as noted earlier in this opinion, this Court has rejected acquiescence as a technique of interpreting legislative texts.

See pages ---- through ---- of this opinion.

Baker , 369 U.S. at 237, 82 S.Ct. 691.

2 Official Record, Constitutional Convention 1961, p. 2463 ("[I]t seemed to me that one of the important things for Michigan to pass muster is to be sure that the people have a remedy to the problem of reapportionment, and that ease of amending the constitution would be an important remedy.") (statement of Delegate Dorothy Judd).

Id . (statement of Delegate Stevens).

In re Apportionment of State Legislature-1982 , 413 Mich. at 139-140, 321 N.W.2d 565. As another court similarly noted, "The makeup and apportionment of the Legislature .... are [questions] far better entrusted to the collective political wisdom of the Legislature subject to the power of initiative and referendum reserved to the people." Silver v. Brown , 63 Cal. 2d 270, 280, 46 Cal.Rptr. 308, 405 P.2d 132 (1965) (emphasis added).

In re Apportionment of State Legislature-1982 , 413 Mich. at 139, 321 N.W.2d 565 (emphasis added).

Id . at 140, 321 N.W.2d 565.

In re Apportionment of State Legislature , 437 Mich. 1208, 1211, 463 N.W.2d 713 (1990) (statement of Levin , J.).

Id .

See Young, Jr., A Judicial Traditionalist Confronts Unique Questions of State Constitutional Law Adjudication , 76 Alb L Rev 1947, 1949 (2013) (noting that if doubt remains as to the meaning of a constitutional provision, courts can use "anything else that might provide an historical context").

Indeed, earlier initiatives dealing with apportionment were placed on the ballot in 1924, 1928, and 1930. See Pollock, The Initiative and Referendum in Michigan (Ann Arbor: University of Michigan Press, 1940), pp. 81-82.

Michigan: A History , pp. 548-549.

Lamb, Pierce & White, Apportionment and Representative Institutions: The Michigan Experience (Washington, DC: Institute for Social Science Research, 1963), p. 130; see also Const 1908, art 5, §§ 2 through 4 (as amended).

Const 1908, art 5, § 4 (as amended).

For example, in 1940, the people voted to amend Const 1908, art 6, to create the Civil Service Commission, which manages employment for all three branches of government. See Const 1908, art 6, § 22 ; Const 1963, art 11, § 5. In 1968, the people successfully amended article 6 of our Constitution to create the Judicial Tenure Commission, a body tasked with investigating instances of judicial misconduct throughout the state. See Const 1963, art 6, § 30. The people enacted the Headlee Amendment in 1978, significantly limiting the taxing powers of state and local government. See Const 1963, art 9, §§ 6, 25 through 34. Term limits for members of the Legislature, as well as the Governor, Attorney General, and Secretary of State, were established by initiative in 1992. See Const 1963, art 4, § 54 ; Const 1963, art 5, § 30.

See Arizona State Legislature v. Arizona Independent Redistricting Comm. , 576 U.S. ----, 135 S.Ct. 2652, 2662, 192 L. Ed. 2d 704 (2015) ("Some States, in common with Arizona, have given nonpartisan or bipartisan commissions binding authority over redistricting. The California Redistricting Commission, established by popular initiative, develops redistricting plans which become effective if approved by public referendum.").

Stephanopoulos, Reforming Redistricting: Why Popular Initiatives to Establish Redistricting Commissions Succeed or Fail , 23 J L & Pol 331, 343-377 (2007) (discussing in detail 12 times when the question of creating a redistricting commission was voted on as a result of voter-initiated amendments).

See Miller, Direct Democracy and the Courts (New York: Cambridge University Press, 2009), p. 151 ("In several initiative states, citizen lawmakers participated in legislative redistricting. For example, in Arizona (1918, 1932), California (1926), Colorado (1932, 1962), Oregon (1952), and Washington (1956), citizens used the initiative power either to determine district lines or to establish new criteria for the legislature to follow when drawing districts."); id . at 152 n. 122 (noting that "[c]itizen lawmakers in two other states, Arkansas (1936) and Michigan (1952), also accomplished redistricting through the initiative process").

Bess , 985 P.2d at 981.

Id . at 988.

Id . (citations omitted).

Though Bess used a qualitative/quantitative test, its underlying reasoning regarding the effect of the amendment on the balance of powers is useful under the standard we adopt today.

CPMC also argues, and Justice Wilder agrees in his separate dissent, that the VNP proposal cannot be put on the ballot because the proposal failed to republish "existing provisions of the constitution which would be altered or abrogated thereby ...." Const 1963, art 12, § 2. In particular, Justice Wilder concludes that the VNP proposal abrogates the Oath Clause, Const 1963, art 11, § 1, which states that, excepting the oath that officers will "faithfully discharge the duties" of their offices, "[n]o other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust." The VNP proposal requires applicants to "attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the Legislature ... and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties." VNP Proposal, art 4, § 6(2)(A)(III) (emphasis added). Because of this abrogation, according to Justice Wilder 's dissent, VNP was required to republish Const 1963, art 11, § 1, and because it did not, the proposal must be kept off the ballot.
We do not agree that the VNP proposal amounts to an abrogation under Const 1963, art 12, § 2 by requiring an oath that is prohibited under Const 1963, art 11, § 1. As VNP noted in its brief, our Court addressed this basic issue in Tedrow v. McNary , 270 Mich. 332, 258 N.W. 868 (1935). In that case, the issue was whether the Oath Clause prohibited a statute that required candidates for a certain public office to file an affidavit or other evidence of their educational qualifications. We upheld the requirement, observing that the Legislature could prescribe qualifications for office and that requiring proof of those qualifications, including in the form of an affidavit, "in no way conflicts with the constitutional provision." Id . at 335, 258 N.W. 868. See also Attorney General v. Macdonald , 164 Mich. 590, 593, 129 N.W. 1056 (1911) (holding that a residency requirement "is not 'a test,' as that word is used in the Constitution, but is rather a special qualification"). This reasoning is why, for example, all judicial candidates are statutorily required to complete an "affidavit ... stating that he or she possesses the constitutional qualifications set forth in section 19 of article VI of the state constitution." MCL 168.544b. Otherwise, it would be impossible to require judicial candidates to confirm that they meet the constitutional qualifications for office. And it is also why all candidates for elective office in Michigan (except those running for president or vice president of the United States) are required to file an affidavit of identity. MCL 168.558. Further, as Justice Wilder notes in his dissent, there is nothing improper about inquiring into a candidate's political affiliation to determine eligibility for a bipartisan commission or board. Therefore, because the VNP proposal simply requires candidates to attest to their qualifications for a position on the commission-a requirement Tedrow allows-the proposal in no way "renders [the Oath Clause] wholly inoperative." Protect Our Jobs , 492 Mich. at 773, 822 N.W.2d 534 ; see also Massey v. Secretary of State , 457 Mich. 410, 418, 579 N.W.2d 862 (1998) ; Ferency , 409 Mich. at 597, 297 N.W.2d 544.